IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


MICHAEL McKENNA,           :    CIVIL ACTION
WILLIAM McKENNA, and       :
RAYMOND CARNATION          :
                           :
          v.               :
                           :
CITY OF PHILADELPHIA       :    NOS. 98-5835, 99-1163


MEMORANDUM

McLaughlin, J.                              July 20, 2010

TABLE OF CONTENTS

I.  FACTUAL BACKGROUND.. . . . . . . . . . . . . . . . . . 3

    A.  The Underlying Events Giving Rise
        to the Litigation.. . . . . . . . . . . . . . . 4

    B.  The History of the Litigation.. . . . . . . . . 9

II. ANALYSIS.. . . . . . . . . . . . . . . . . . . . . . 21

    A.  The Plaintiffs' Post-Judgment Motion . . . . . . . 21

        1.  The Exclusion of William and Michael
            McKenna's Terminations . . . . . . . . . . . 22

        2.  The Imposition of Title VII's
            Statutory Cap on Damages and the
            Denial of Plaintiffs' Request to
            Mold the Verdict and/or add a
            PHRA Claim.. . . . . . . . . . . . . . . . . 27

        3.  The Limited Post-Verdict Discovery
            Concerning Raymond Carnation's
            Tax Returns . . . . . . . . . . . . . . . . 32

        4.  The Failure to Enter Final Judgment
            for William and Michael McKenna
            After the Jury Verdict . . . . . . . . . . . 37

        5.  The Calculation of Raymond Carnation's
            Back Pay . . . . . . . . . . . . . . . . . . 40

        6.  The Issuance of a Stay of Execution
            of Judgment without a Bond . . . . . . . . . 48

    B.  The Defendant's Post-Judgment Motions . . . . . . 51

        1.  The Motion for Judgment as a Matter
            of Law . . . . . . . . . . . . . . . . . . . 52

            a.  Michael McKenna's Claims Relating
                to his Assault.. . . . . . . . . . . . . 53

b.    Raymond Carnation's Claims Relating
      to his Custody Dispute . . . . . . . . .  59

c.    Raymond Carnation's Claims Relating
      to his Termination . . . . . . . . . . . .  63

2.    The Motion for a New Trial . . . . . . . . .  76

    a.    New Trial Based on the Misconduct
        of the Plaintiffs' Counsel, the
        Plaintiffs, and the Plaintiffs'
        Spouses . . . . . . . . . . . . . . . . .  77

      (1)  References to Non-Triable
           Issues . . . . . . . . . . . . . . .  78

          (a)  References By Counsel to
               Non-Triable Issues . . . . . . .  79

          (b)  References By Plaintiffs
               and Their Spouses to
               Non-Triable Issues . . . . . . .  89

      (2)  Disrespectful Conduct by the
           Plaintiffs and their Counsel
           and References at Closing to
           <u>A Few Good Men</u> and to
           The "C word" . . . . . . . . . . .  93

      (3)  Whether the Misconduct Warrants
           a New Trial . . . . . . . . . . . .  99

    b.    New Trial on the Ground that the
        Verdict Was Against the Weight of
        the Evidence . . . . . . . . . . . . . . . 106

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL McKENNA,                    :      CIVIL ACTION
WILLIAM McKENNA, and               :
RAYMOND CARNATION                   :
                                    :
        v.                          :
                                    :
CITY OF PHILADELPHIA                :      NOS. 98-5835, 99-1163


MEMORANDUM

McLaughlin, J.                              July 20, 2010


        This is a civil rights action brought against the City

of Philadelphia police department by three former Philadelphia

police officers, William McKenna, Michael McKenna, and Raymond

Carnation.  The three plaintiffs, although not African-American

themselves, allege that they suffered actionable retaliation for

opposing racially-discriminatory treatment of African-American

officers in their district.

        After lengthy pre-trial proceedings, the Court held an

eight-day jury trial in May 2008 on the plaintiffs' claims for

retaliation under Title VII, 42 U.S.C. § 2000e, et seq.  The jury

found in favor of all three plaintiffs and awarded non-pecuniary

damages in the amount of $2,000,000 for Raymond Carnation,

$3,000,000 for William McKenna, and $5,000,000 for Michael

McKenna.  After a subsequent evidentiary hearing, the Court

awarded plaintiff Raymond Carnation back pay in the amount of

$208,781. The City successfully moved to limit the jury verdict to $300,000 for each plaintiff under Title VII's statutory cap on non-pecuniary damages, 42 U.S.C. § 1981a(b)(3). The Court entered a final judgment on July 24, 2009, awarding each plaintiff $300,000 in non-pecuniary damages and awarding Raymond Carnation $208,781 in back pay and $46,560 in pre-judgment interest on his back pay award.

Both the City and the plaintiffs filed timely post-trial motions. The City has filed a motion for the entry of judgment in its favor on several claims by Raymond Carnation and Michael McKenna, which the City contends, if granted, will require vacating Carnation's back pay award and awarding a new trial on damages for these two plaintiffs' remaining claims. The City also moves for a new trial as to all plaintiffs on the ground that the jury verdict in their favor was the result of passion and prejudice caused by alleged misconduct by the plaintiffs and their counsel during trial and on the ground that the verdict was against the weight of the evidence. In the alternative, the City seeks a remittitur.

The plaintiffs filed a post-trial motion entitled a "motion for judgment as a matter of law and a new trial on equitable relief and judgment of entried [sic] jury verdict award under the Pennsylvania Human Relations Act." Although styled as a motion for judgment as a matter of law and for a new trial, the

substance of the motion is more in the nature of a motion for reconsideration because it challenges a number of the Court's pre- and post-trial rulings. The plaintiffs challenge the Court's pre-trial orders excluding the terminations of Michael and William McKenna from the issues to be tried and its post-trial order applying Title VII's statutory cap to the jury verdict. The plaintiffs also challenge the Court's calculation of Raymond Carnation's back pay and its decision to stay the execution of the judgment without bond.

For the reasons that follow, the Court will deny the parties' motions.

I.    FACTUAL BACKGROUND

To place the issues raised in the parties' post-judgment motions in context, it is necessary to give a summary of the events that gave rise to this case and the procedural history of the subsequent litigation. In describing the factual background of the plaintiffs' claims, the Court has done so in the light most favorable to the plaintiffs as the verdict winners. Where the factual background discusses events not addressed at trial, the Court has cited to the earlier opinion of the court of appeals in this case, Moore v. City of Philadelphia, 461 F.3d 331 (3d Cir. 2006).

A.    <u>The Underlying Events Giving Rise to the Litigation</u>

In the late 1990's, plaintiffs William McKenna, Michael McKenna, and Raymond Carnation were Philadelphia police officers assigned to the 7-squad of the 25th District of the Philadelphia Police Department.  The 25th District encompassed a high-crime area in North Philadelphia colloquially referred to as the "the Badlands."  Michael McKenna was assigned to the 7-squad after his 1996 graduation from the Philadelphia Police Academy.  Raymond Carnation and William McKenna, who is Michael's brother, were transferred to the 7-squad in July or August 1997.  5/6/08 N.T. at 15, 18-19, 24-25, 244-46; 5/7/08 N.T. at 159-60.

As of late August 1997, command of the 25th District was assigned to Captain William Colarulo.  Upon taking over, Captain Colarulo began saturation details within the district in an attempt to disrupt drug dealing.  These measures included erecting manned street barricades to interdict non-residents from entering neighborhoods to buy drugs.  In October 1997, Sergeant John Moroney, who had been one of the rotating supervisors of the 7-squad, was made permanent supervisor.  5/5/08 N.T. at 37; 5/6/08 N.T. at 32-33, 59, 250.

Both before and after he became permanent supervisor, Sergeant Moroney made racially derogatory statements and took racially discriminatory actions in the plaintiffs' presence.  In one of these incidents, Michael McKenna, while driving in his

4

patrol car, came upon an African-American officer, Myrna Moore,
who was standing in the rain.  McKenna told Moore that she was
supposed to be working with him and to get in his car and out of
the rain.  Sergeant Moroney then arrived at the location and,
using a racial epithet, asked why Moore was in McKenna's car.
Moroney then ordered McKenna to leave Moore, return his car to
the station, and then return to Moore's post to join her in the
rain.  5/6/08 N.T. 249-52; 5/7/08 N.T. at 21-26, 162-68.

In another incident, William McKenna who, along with
Raymond Carnation, had been complaining to Moroney about racial
problems in the 7-squad, told Moroney of a conversation he had
had with an African-American officer, Carla Wilson.  McKenna told
Moroney that Wilson had said that she thought Moroney was
treating her unfairly.  Moroney responded that McKenna could
"tell that critter to do what she has to do if she has a
problem."  5/6/08 N.T. at 43-45.

In the fall and winter of 1997, the plaintiffs were
also subjected to harassment from their co-workers.  Michael
McKenna had told Moroney about a scheme among fellow officers to
inflate overtime hours.  William McKenna and Raymond Carnation
had also made several complaints to Moroney concerning the
conduct of fellow officers.  After these communications, officers
began referring to the three plaintiffs as "snitches" and "rats,"
and graffiti referring to them as such was written on the walls

of the station bathroom.  The word "rat" was also written on William McKenna's time sheet.  5/6/08 N.T. at 44-50, 257-60; 5/7/08 N.T. at 70-71.

Beginning in October 1997, the three plaintiffs spoke to their superiors, including Captain Colarulo and Lieutenant Frank Bachmayer, about racial tensions in the 25th District.  By December 1997, all three plaintiffs had complained to their superiors about Sergeant Moroney's racially insensitive language and behavior.  On February 6, 1998, Raymond Carnation was called into Captain Colarulo's office to discuss the fact that he had left his post and gone home without permission the day before.  At that meeting, Captain Colarulo threatened to make Carnation's life a "living nightmare" if he made an EEOC complaint and ordered him to apologize for making accusations against Sergeant Moroney.  5/6/08 N.T. at 44-47; 5/7/08 N.T. at 166-68, 175-77.

A little over a week later, on February 14, 1998, William McKenna made a comment while at the station that he hoped Sergeant Moroney "would get shot."  In response to the comment, later that day, William McKenna's service weapon was confiscated, and he was assigned to restricted duty and ordered to undergo a psychiatric evaluation.  That same evening, Michael McKenna overheard Sergeant Moroney saying that he would kick his and his brother's ass.  Fifteen minutes later, Michael McKenna was assaulted by another officer and injured his wrist when he fell

6

during the assault.  5/6/08 N.T. at 64-73; 5/7/08 N.T. at 30-38, 43-44.

By May 1998, all three plaintiffs were no longer assigned to the 25th District; in the next year, all three would leave the police department.  By March 5, 1998, William McKenna was transferred from the 25th District to the police academy where he was placed on limited duty.  In mid-February 1998, Michael McKenna was transferred to the 19th District.  Carnation remained in the 25th District until May 1998, when he was granted restricted duty and assigned to the police academy.  5/6/08 N.T. at 74-76; 5/7/08 N.T. at 54, 180, 187.

In July 1998, Michael McKenna filed a private criminal complaint against the officer who assaulted him, a witnessing officer, and Sergeant Moroney.  Filing such a complaint instead of resorting to internal disciplinary procedures was against police policy and McKenna was investigated by Internal Affairs. Michael McKenna was ultimately discharged from the police department in October 1999.  5/7/08 N.T. at 69; Moore, 461 F.3d at 339.

William McKenna was on restricted duty after February 1998.  Pursuant to a Philadelphia police policy that allowed such duty to last no longer than six months, McKenna's restricted duty was cancelled in November 1998 and he was placed on medical

leave.  While on medical leave, McKenna was subject to "sick checks," in which supervisors would visit his house and confirm he was there.   McKenna was subjected to at least one sick check in November 1998 and more frequent sick checks in January, February, and March of 1999.  McKenna was dismissed in May 1999 for failing such checks.  5/6/08 N.T. at 74-81, 88-89, 98-99. 184; <u>Moore</u>, 461 F.3d at 338-399.

Carnation had been transferred to restricted duty at the police academy in May 1998.  Shortly after his transfer, on the Friday before Memorial Day weekend, he placed several calls to the 25th District, seeking to speak to Sergeant Moroney.  He was ordered to stop calling by Captain Colarulo, but understood the order to require him only to stop calling that day.  The next day, Saturday, Carnation called the 25th District again and spoke to Moroney.  On Sunday morning of Memorial Day weekend, Carnation called Captain Colarulo, who was off-duty and at his shore house, to speak with him about Moroney.  In July 1998, Carnation was served with disciplinary papers for his Memorial Day telephone calls.  5/7/08 N.T. at 180-86, 207-12.

Also in the summer of 1998, Colarulo became involved in a custody dispute involving Carnation.  Robin Kelly, the mother of Carnation's daughter, contacted Colarulo sometime in June or July 1998 seeking his help with on-going problems with Carnation.  Although Carnation was no longer under Colarulo's command,

Colarulo had Kelly transported to the 25th District where he interviewed her and then had her transported to another district to report Carnation's behavior to detectives. 5/8/10 N.T. 179-83.

Carnation was terminated from the police department on March 12, 1999, as a result of the charges brought against him by Captain Colarulo arising from his telephone calls over Memorial Day 1998. 5/7/08 N.T. at 194-95, 214-15.


B.    The History of the Litigation

On April 29, 1998, the McKennas and Carnation and three African-American officers, including Myrna Moore, filed a complaint with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission, alleging racially-motivated discrimination and retaliation in the department. The McKennas and Carnation alleged that they had suffered racially-motivated harassment and discrimination because they had opposed discrimination against their African-American co-workers.

In November 1998, Michael McKenna filed Case No. 98-5835 in this Court, bringing claims against the City of Philadelphia under Title VII and claims against the City and since-dismissed individual defendants for retaliation under 42 U.S.C. § 1981 and invasion of privacy under 42 U.S.C. § 1983. In March 1999, William McKenna, Carnation, and the three African-

American officers filed a separate suit, Case No. 99-1163.  This
suit brought claims against the City for retaliation under Title
VII and claims against the City and since-dismissed individual
defendants for retaliation and discrimination under § 1981 and
deprivation of procedural and substantive due process under
§ 1983.  The two cases were consolidated for discovery on May 4,
2000.[1]

In May, 2001, the three African-American plaintiffs in
Case No. 99-1163 voluntarily dismissed their claims against all
defendants.  Also in May 2001, William McKenna moved to amend his
complaint to add a claim for wrongful discharge under 42 U.S.C.
§§ 1981 and 1983.  This motion was denied.

_____

[1]     Initially, all six plaintiffs were represented by the
same attorney.  In February 2001, the plaintiffs' attorney moved
to withdraw as counsel for William McKenna, Michael McKenna, and
Raymond Carnation, but to continue representing the three
African-American plaintiffs.  After a hearing, the Court granted
the motion to withdraw and asked the Clerk of Court to appoint
counsel for the McKennas and Carnation.  Michael McKenna
subsequently obtained individual counsel and William McKenna and
Raymond Carnation together obtained representation by a separate
attorney.  In March 2002, replacement counsel for William McKenna
and Raymond Carnation moved to withdraw.  After a hearing, the
Court denied this motion in a memorandum and order filed under
seal on March 21, 2002.  After the Court granted the defendants
summary judgment and the plaintiffs filed a notice of appeal,
counsel for William McKenna and Raymond Carnation again moved to
withdraw.  The Court denied the motion for lack of jurisdiction
because of the pending appeal.  On appeal, the plaintiffs at
first proceeded pro se, but were subsequently appointed appellate
counsel by the court of appeals.  After remand, the three
plaintiffs obtained new counsel, who has represented them
throughout subsequent proceedings.

In September 2002, the defendants moved for summary judgment on all claims against them. On January 17, 2003, after Michael McKenna, William McKenna, and Raymond Carnation had voluntarily dismissed their § 1981 claims and their claims against certain individual defendants, this Court granted summary judgment against them on the remaining claims. All three plaintiffs appealed.

On August 13, 2006, the United States Court of Appeals for the Third Circuit issued an opinion reversing the grant of summary judgment as to the plaintiffs' Title VII retaliation claims: Moore v. City of Philadelphia, 461 F.3d 331 (3d Cir. 2006). The decision found that the plaintiffs had presented sufficient evidence to create a genuine issue of material fact as to whether they had suffered unlawful retaliation under Title VII and remanded the case for further proceedings.

After remand, the plaintiffs moved to amend their complaints in various ways to add claims concerning their terminations. The plaintiffs moved to add § 1983 first amendment retaliation claims, which would encompass their terminations, to be brought against individual defendants named in the plaintiffs' initial complaints, but subsequently dismissed. In the alternative, the plaintiffs argued that, even if permission to amend their claims was denied, they should still be permitted to receive damages for their termination as part of their recovery

on their existing claims.  In addition, plaintiff William McKenna
moved for reconsideration of the Court's 2001 Order denying him
leave to amend his complaint to file claims for wrongful
termination under § 1981 and § 1983.

The Court denied the motion in a Memorandum and Order
of May 15, 2007.  After reviewing the procedural history, the
briefing on appeal, and the <u>Moore</u> decision, the Court interpreted
<u>Moore</u> as remanding only the plaintiffs' claims for retaliation
under Title VII against the City, but not the claims remaining
against the individual defendants, which were brought under other
statutes.  The Court also determined that the plaintiffs'
terminations had not been a part of the plaintiffs' case prior to
the appeal and so were not part of the case after remand.  The
Court then denied the plaintiffs leave to amend, finding that any
wrongful termination claims asserted against the individual
defendants would be time-barred and that amendments to add such
claims against the City, while not time-barred, should be denied
on grounds of undue delay and prejudice.  The Court also denied
William McKenna's request for reconsideration of its 2001 Order.[2]

---

[2]     In addition to moving in these cases to add claims for
wrongful termination, William McKenna, pro se, filed a separate
action in 2006, Case No. 06-1705, to bring wrongful termination
claims arising from the same events at issue here.  The Court
dismissed this action in November 2007 and this dismissal was
affirmed on appeal.  <u>McKenna v. City of Philadelphia</u>, 304 Fed.
Appx. 89 (3d Cir. 2008).

The plaintiffs then filed an "omnibus" motion seeking alternatively to have the Court reconsider its May 15, 2007, ruling, to have the Court certify the issue for interlocutory appeal, or to have the Court stay the case so that the plaintiffs could file a writ of mandamus. As part of their motion, the plaintiffs noted for the first time that Raymond Carnation's termination – but not that of William or Michael McKenna – was specifically mentioned in the applicable complaint as one of the retaliatory actions taken by the defendants. In an order entered November 28, 2007, the Court granted reconsideration as to plaintiff Raymond Carnation's claims for wrongful termination, allowing him to seek to recover for his termination as part of his existing claims. The Court denied reconsideration of all other aspects of its May 15, 2007, Memorandum and Order, and denied the plaintiffs' motion to certify that order for interlocutory appeal or stay the case pending the filing of a writ of mandamus.

The plaintiffs filed a second motion for reconsideration on December 7, 2007, asking the Court to reconsider its ruling that William and Michael McKenna's terminations were not already a part of their claims. The Court denied this motion on December 12, 2007, and, after a conference with the parties and with their consent, the Court consolidated both cases for trial and set a trial date for March 10, 2008.

The plaintiffs filed a petition for writ of mandamus and a motion for stay with the United States Court of Appeals for the Third Circuit on December 21, 2007, challenging the exclusion of the McKennas' terminations as issues for trial. In January 2008, the parties jointly moved before this Court for a stay of the trial date because of the pending mandamus petition, stating that the parties had been engaged in good-faith settlement negotiations, but could not productively discuss settlement until it was known whether William and Michael McKenna's terminations would be part of the case to be tried. On January 29, 2008, the court of appeals denied the motions for a writ of mandamus and a stay, and the Court rescheduled trial for May 2008.

In pre-trial motions, the plaintiffs and defendants disagreed about what issues had been remanded to this Court after the appellate reversal of summary judgment and remained in the case. After reviewing the parties' arguments and the appellate opinion, the Court set out in an order the issues that it found to have been remanded by the court of appeals and which were to be tried to the jury:

> . . . the questions for trial will be whether the following events were caused by the defendant's unlawful retaliation against the specific plaintiff.
>
> 1. William McKenna
>
> (a) The discipline William McKenna received in and after February 1998 resulting from the comment that "Sergeant Moroney should be shot

14

. . ..": having his weapon stripped from him;
having his duties changed; being ordered to
undergo a psychiatric evaluation; receiving a
negative performance evaluation; receiving a
30-day suspension, and being transferred from
the 25 District. <u>Moore</u>, 461 F.3d at 346.

(b) The allegedly excessive number of sick
checks William McKenna received after he
filed this lawsuit on March 5, 1999. <u>Id.</u> at
352.

2. Michael McKenna

(a) Being forced to stand in the rain along
with Officer Myrna Moore sometime in the fall
or winter of 1997, and other retaliatory
treatment by Sgt. Moroney. <u>Id.</u> at 335, 347.

(b) The alleged assault by a fellow police
officer in February 1998 after Sgt. Moroney
allegedly threatened to "kick [Michael's]
ass." <u>Id.</u> at 347.

(c) The lateral transfer Michael McKenna
received in February 1998 after his alleged
assault. <u>Id.</u>

3. Raymond Carnation

(a) The pattern of alleged harassment
directed against Carnation beginning in
February 1998, including the fact that he was
kept in the 7th Squad after both McKennas
were transferred out. <u>Id.</u> at 348-49.

(b) The discipline Carnation received for
attempting to contact his supervisors over
the Memorial Day weekend of 1998. <u>Id.</u>

(c) Captain Colarulo's involvement in
Carnation's custody dispute with the mother
of Carnation's child during the summer of
1998. <u>Id.</u>

(d) His termination from the Police
Department. See Order of November 27, 2007
(Docket No. 125 in [Case No] 99-1163).

Order of May 1, 2008 (Docket No. 131 in Case 98-5835; No. 150 in Case No. 99-1163).

In a separate order, also issued on May 1, 2008, the Court ruled on many of the parties' motions in limine. In that second May 1 Order, the Court stated that, because the parties had not agreed to submit the issue of Raymond Carnation's equitable remedies including the availability of front and back pay to the jury, that issue would be decided in a separate proceeding, and no evidence about Carnation's damages would be admissible at trial.

The Court held a jury trial in this matter from May 5 through May 14, 2008. At the charge conference, held with counsel on the second-to-last day of the trial, the plaintiffs moved to amend their complaints to add § 1983 claims based on the First and Fourteenth Amendment and to include Title VII disparate treatment and hostile work environment claims. The Court denied the plaintiffs' motion. 5/13/08 Tr. at 224-225. The instructions given to the jury included only one claim for each plaintiff under "a federal Civil Rights Statute," a retaliation claim under Title VII. 5/14/08 Tr. at 168.

On May 14, 2008, after approximately two and a half hours of deliberation, the jury returned a verdict in favor of all three plaintiffs and awarded compensatory damages in the amount of $2,000,000 for Raymond Carnation, $3,000,000 for

16

William McKenna, and $5,000,000 for Michael McKenna.  After the
verdict, the Court stated on-the-record that it would not enter
an immediate judgment on the verdict because the parties
anticipated filing motions on the applicability of Title VII's
statutory cap and the availability of front and back pay damages
for Raymond Carnation.  5/14/08 Tr. at 220-21.

       After the verdict, the parties filed a flurry of
motions.  The plaintiffs filed a motion for entry of judgment and
a petition for attorneys fees.  The Court denied these motions
without prejudice to the plaintiffs' right to reassert them after
proceedings on Carnation's equitable damages.  The plaintiffs
also filed a motion to add Michael and William McKenna's
terminations to the case, styled as a motion to amend the
complaint to conform to the evidence at trial or, in the
alternative, as a motion for reconsideration.  The Court denied
this motion, again reaffirming its earlier rulings that the
McKennas' terminations had not been part of the case as pled or
tried.  The City filed a motion to dismiss Carnation's claim on
judicial estoppel grounds for failing to list his claim against
the City in a 2003 bankruptcy filing, which the Court denied.
The plaintiffs also filed a motion to "allocate, mold and/or
allow" the jury verdict to be awarded for a violation of the
Pennsylvania Human Rights Act, which would avoid Title VII's
statutory cap.  The Court did not immediately decide this motion.

After a telephone conference with counsel, the Court permitted limited discovery on the issue of plaintiff Carnation's front and back pay. This discovery proved protracted, with both parties filing motions to compel discovery and for sanctions, each accusing the other of dilatory conduct. The Court denied the requests for sanctions but ordered Carnation to produce all relevant tax records in his possession and to provide authorizations to allow the City to obtain from the IRS those records that Carnation had not retained. The Court also allowed the City to depose Carnation and for the plaintiffs to depose Deputy Commissioner Jack Gaitens, who was proffered by the City to give evidence relevant to its after-acquired evidence defense concerning Carnation's post-termination conviction for marijuana, which the City contended should cut off Carnation's entitlement to back pay. As part of its motion practice, the plaintiffs moved, among other relief, for the recusal of the undersigned and for the certification of the Court's order permitting discovery for interlocutory appeal. The Court denied these requests.

On February 3, 2009, the plaintiffs filed a request to schedule a trial date, stating that all discovery on the issue of Carnation's equitable damages was complete. After receiving the City's confirmation that discovery was complete, the Court set a schedule for pre-hearing motions and a pre-hearing conference. After the conference, the Court scheduled a date for the hearing.

The Court held the hearing on Carnation's claim for
equitable damages on May 18, 2009.  The Court issued its decision
on July 7, 2009.  The Court found that Carnation was entitled to
$208,781 in back pay for the period from his termination from the
police department on March 12, 1999, through August 30, 2005, the
date on which the Court found that Carnation had become
completely disabled and had stopped seeking employment and
effectively withdrawn from the workforce.

In assessing Carnation's damages, the Court rejected
the City's after-acquired evidence defense, but found that
Carnation's award of back pay should be cut off as of August 30,
2005, for two reasons.  First, as of that date, Carnation had
withdrawn from the workforce and therefore failed to mitigate his
damages, and second, as of that date, Carnation was completely
disabled by depression.  In reaching this second finding, the
Court relied in part on a finding of disability by the Social
Security Administration.

After its decision awarding equitable damages, the
Court ruled on the plaintiff's request for pre- and post-judgment
interest and delay damages, awarding pre-judgment interest in the
amount of $46,560.  The Court also ruled on the plaintiff's
pending motion to mold the jury verdict on compensatory damages
to apportion any amount in excess of Title VII's statutory cap to
be awarded under the PHRA, which lacks a statutory cap.  The

Court denied this motion, finding that the verdict could not be molded because the plaintiffs had failed to bring a claim under the PHRA and could not amend their claims to add such a claim post-verdict.

On July 24, 2009, the Court entered a final judgment in the case against the City and in favor of each plaintiff for compensatory damages of $300,000, the amount of Title VII's statutory cap, and in favor of Raymond Carnation for back pay of $208,781 and pre-judgment interest on that award of $46,560. The City subsequently moved to stay execution of the judgment without a bond and to extend the time for briefing post-judgment motions. The Court granted both motions.

Both parties filed post-judgment motions on August 10, 2009. The City filed a motion for new trial and for judgment notwithstanding the verdict. The plaintiffs filed a motion for a new trial. After these motions were filed, the plaintiffs filed a notice of appeal, challenging numerous pre- and post-trial orders by the Court. This appeal has been stayed by the court of appeals pending a decision on the post-trial motions.[3]

---

[3] After the parties' post-judgment motions had been filed, counsel for the plaintiffs wrote an ex parte letter to the Chief Judge of this district court, complaining that several of the rulings in this case showed bias. The undersigned was not copied on the letter. After receiving a copy of the letter from the Chief Judge, the undersigned wrote a response to all counsel, noting that it would place the plaintiff's letter on the docket, so that it would no longer be ex parte, and responding to one new factual allegation in the letter. In his letter, the plaintiffs'

II.  ANALYSIS

    A.  The Plaintiffs' Post-Judgment Motion

        The plaintiffs have filed a motion entitled

"Plaintiff's Post Trial Motion for Judgment as a Matter of Law

and a New Trial on Equitable Relief and Judgment of Entried [sic]

Jury Verdict Award under the Pennsylvania Human Rights Act."  The

motion raises five issues, all of which this Court has previously

addressed in pre-judgment rulings.

        The motion challenges:  1) the exclusion of William and

Michael McKenna's claims relating to their terminations; 2) the

imposition of Title VII's statutory cap to the plaintiffs'

compensatory damage verdicts and the denial of plaintiffs'

requests to construe their suit as having included claims under

the PHRA which would not be subject to statutory cap; 3) the

lengthy course of post-trial proceedings concerning discovery on

Raymond Carnation's claim; 4) the refusal to enter judgment on

Michael and William McKenna's claims immediately after the

verdict; 5) the determination of the cut-off date for Raymond

Carnation's back pay; and 6) the entering of a stay of execution

_____

counsel stated that he had been informed by an unnamed staff
member in the City Law Department that the undersigned had
telephoned the City Law Department during the trial and expressed
a "concern that the City was losing the trial."  The Court's
response stated, for the record, that the undersigned had never
had any ex parte conversations with anyone from the City
concerning this lawsuit and did not telephone the City Law
Department during the trial concerning this lawsuit.

on the judgment without an evidentiary hearing and without a bond.

The Court will deny the plaintiffs' motion.

1    The Exclusion of William and Michael McKenna's Terminations

As set out above in the discussion of this case's procedural history, after this matter was remanded from the United States Court of Appeals for the Third Circuit, the plaintiffs moved to amend their complaints to add claims for wrongful termination or, in the alternative, for a ruling allowing them to recover damages from their terminations as part of their existing claims.  The Court initially denied the motion with respect to all three plaintiffs, but upon reconsideration, found that plaintiff Raymond Carnation had included his termination as one of the alleged retaliatory acts pled in his complaint, and so could recover damages from his termination. The Court denied reconsideration with respect to William and Michael McKenna.

Since the Court's ruling, the plaintiffs have filed at least six additional motions that seek to revisit the exclusion of Michael and William McKenna's terminations.  See Docket Nos. 127, 143, 172, 210, 225, and 282 in Case No. 99-1163.  The Court denied those earlier motions and similarly denies the plaintiffs'

post-judgment motion for a new trial on the issue of the McKennas' terminations.

The McKennas' terminations have never been included in this case. The terminations were not part of the case as originally pled. Unlike Raymond Carnation, William and Michael McKenna did not include their terminations in their complaints as one of the adverse actions alleged to have resulted from the defendants' unlawful discrimination and retaliation.

The terminations were also not part of the case as litigated prior to the 2003 grant of summary judgment. William McKenna moved in 2001 to amend his complaint to add claim of wrongful termination. The Court denied the motion as futile, finding the claim time-barred because William McKenna had not given the defendants sufficient notice of his claim to allow it to "relate back" to his original filing and toll the statute of limitations. William McKenna did not pursue the Court's denial of his request to amend in his appeal. In their oppositions to the defendants' summary judgment motions, neither William nor Michael McKenna included their terminations as one of the alleged adverse employment actions they suffered from the defendants' wrongful conduct. See January 17, 2003 Memoranda and Orders granting summary judgment, Docket No. 72 in Case No. 98-5835 at 23-24, Docket No. 88 in Case No. 99-1163 at 30-31.

When, after remand, the plaintiffs retained new counsel
and moved to amend their complaints to add wrongful termination
claims against the originally-named individual defendants and,
alternatively, to otherwise be allowed to recover wrongful
termination damages, the Court denied the request as to William
and Michael McKenna.  Finding that the McKennas' terminations
were not part of their existing claims, the Court denied the
request to amend on grounds of futility, delay and prejudice.
The Court found that the wrongful termination claims that the
McKennas sought to raise against the individual defendants were
time-barred and that any motion to amend would be futile.  To the
extent that such claims were not time-barred against the City,
the Court found that the plaintiffs' request, coming after seven
years of litigation and the close of discovery, was too late and
would cause undue prejudice to the defendants.  May 15, 2007,
Memorandum and Order (Docket No. 100 in Case No. 98-5835, Docket
No. 121 in Case No. 99-1163).

Although the Court granted reconsideration of its
decision as to Raymond Carnation, finding that his termination
was pled as an adverse employment action in his original
complaint, it denied reconsideration of its decision as to
William and Michael McKenna.  The Court subsequently denied the
plaintiffs' numerous subsequent requests to reconsider its

decision as to the McKennas because the plaintiffs presented no new facts or evidence to justify reconsideration.

The McKennas' terminations were not included in the case tried to the jury. The Court's Order setting out the issues for trial included Raymond Carnation's termination, but not those of the McKennas. May 5, 2008, Order (Docket No. 131 in Case No. 98-5835, Docket No. 150 in Case No. 99-1163). The Court, accordingly, denied the plaintiffs' post-trial motion to amend the pleadings under Federal Rule of Civil Procedure 15(b), which sought add wrongful termination claims for William and Michael McKenna on the ground that those issues had been tried by implied consent. June 13, 2008, Order (Docket No. 172 in Case No. 98-5835, Docket No. 189 in Case No. 99-1163).

Now, in their motion for new trial, the plaintiffs contend that the Court erred in excluding Michael and William's terminations from the case and seek a "new equity trial" to allow the McKennas to recover front and back pay. In support of their request, the plaintiffs offer no arguments that the Court has not previously considered and rejected.

The plaintiffs argue that it was error to conclude that Michael and William McKenna's terminations were not included in this action merely because the word "termination" was not mentioned in their complaints. As discussed above, the Court's finding that the McKennas' terminations were not part of this

case did not rest solely on the failure to mention the terminations in the complaints but also on the failure to include the terminations in the plaintiffs' opposition to summary judgment and on William McKenna's unsuccessful motion to add wrongful termination claims.

The plaintiffs also argue that the McKennas must be allowed to recover damages flowing from their terminations in order to fulfill Title VII's purpose of "making whole" victims of discrimination and retaliation. To recover such damages, however, a plaintiff must have pled and proven that he was terminated or constructively discharged as a result of the defendant's wrongful actions. See Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 n.6 (3d Cir. 2006) ("[A] plaintiff alleging employment discrimination must show either actual or constructive discharge in order to receive an award of back pay."). As discussed above, the McKennas have not done so here.

The Court finds no error in its prior rulings declining to allow William and Michael McKenna to recover damages from their terminations or to amend their pleadings to state a claim for wrongful termination.

2    The Imposition of Title VII's Statutory Cap on
         Damages and the Denial of Plaintiffs' Request to
         <u>Mold the Verdict and/or add a PHRA Claim</u>

As amended in 1991, the Civil Rights Act of 1964,

encompassing the plaintiffs' Title VII claims, permits a

plaintiff to recover compensatory damages for "future pecuniary

losses, emotional pain, suffering, inconvenience, mental anguish,

loss of enjoyment of life, and other nonpecuniary losses."  42

U.S.C. § 1981a(b)(3).  This same provision, however, sets an

upper limit on such damages.  <u>Id.</u>; <u>see also</u> <u>Pollard v. E.I. du

Pont de Nemours & Co.</u>, 532 U.S. 843, 847-48 (2001).  For an

employer like the City with more than 500 employees, this limit

is $300,000.  42 U.S.C. § 1981a(b)(3)(D).

On July 16, 2009, the Court applied Title VII's

statutory damage cap to the amounts awarded to the plaintiffs in

the jury verdict.  The plaintiffs contend in their motion for a

new trial that this was error.  The plaintiffs do not dispute

that the damages awarded by the jury are subject to the cap.

Instead, they argue that the Court should have molded the verdict

to apportion any damages in excess of the statutory cap to be

awarded pursuant to a state law PHRA claim, which is not subject

to any statutory cap on damages.[4]

_____

        [4]    In their motion, the plaintiffs incorrectly state that
the Court imposed Title VII's cap sua sponte.  The City raised
the issue of the cap in the parties' Proposed Final Joint
Pretrial Order (Docket No. 118 in Case No. 98-5835, Docket No.
138 in Case No. 99-1163) ("Defendant further notes that

The Court considered and rejected the plaintiffs'
request to mold the verdict in its July 16, 2009, Memorandum and
Order.  Nothing in the plaintiffs' new trial motion provides any
basis for reconsidering the Court's earlier decision.

In its prior ruling, the Court recognized that a
district court is permitted, in appropriate circumstances, to
apportion damages between capped and uncapped claims to maximize
the jury award recovered by the verdict winner.  See <u>Gagliardo v.
Connaught Labs., Inc.</u>, 311 F.3d 565, 572 (3d Cir. 2002).  All of
the decisions approving of such an apportionment, however,

---

plaintiffs' compensatory and punitive damages awards would be
capped at a maximum of $300,000 per plaintiff").  The City also
made a an oral request to impose the statutory cap after the
announcement of jury's verdict:

> THE COURT:  . . . All right.  And what is the
> - what - is there a request this be limited
> to - what is it, $300,000 per person?
> [PLAINTIFFS' COUNSEL]:  I'm sure the City is
> going to -
> [DEFENDANT'S COUNSEL]:  Yes, Your Honor.
> [PLAINTIFFS' COUNSEL]:  I mean the caps are
> the caps, but you still have to decide the
> issue on wages for Ray Carnation too.  So I'm
> sure there is going to be some ancillary
> proceedings.
> THE COURT:  Of course.  Of course . . .

5/14/08 N.T. at 220.  Shortly after the entry of the verdict, the
plaintiffs filed a motion and a praecipe for entry of final
judgment for each plaintiff in the amount of the jury verdict and
a motion to alter the judgment to award damages under the PHRA to
avoid the Title VII cap.  The motion to amend acknowledged that
the plaintiffs' compensatory damage award was made under Title
VII and that Title VII caps such damages.  See Docket No. 154 in
Case No. 98-5835, Docket No.171 in Case No. 99-1163, at 1-2.

involve cases in which both capped and uncapped claims have been tried to a favorable verdict.  The Court therefore concluded that, in order for the plaintiffs' jury verdict to be molded to avoid Title VII's statutory cap, there must be an uncapped PHRA claim in the case upon which to apportion the excess amount.  The plaintiffs have provided no authority to cast doubt on this conclusion.

The Court next determined that the plaintiffs had not brought a PHRA claim in this case.  None of the plaintiffs' complaints filed in this case ever included a PHRA claim, and the only claims submitted to the jury were the plaintiffs' claims under Title VII.  At the charge conference prior to the submission of the case, the plaintiffs' counsel did not raise the issue of submitting a PHRA claim to the jury.

In their motion for a new trial, the plaintiffs contend that they did plead a PHRA claim.  They point to two separate motions to amend their complaints, one by William McKenna in 2001 and the other by all three plaintiffs in 2007.  Each of these motions sought to amend the complaints to add claims for wrongful termination.  Although not mentioned in the motions themselves, the proposed amended complaints attached to each motion also contain PHRA claims.  The plaintiffs describe these complaints as having been "filed" and therefore contend that these "filings" state PHRA claims.  Plaintiff's Post-Trial Motion at 30 and 33.

This is mistaken.  Both the 2001 and the 2007 motions to amend were denied, and the proposed amended complaints were never filed.[5]  The operative complaints in this case do not contain PHRA claims, and the fact that the plaintiffs unsuccessfully sought to file amended complaints adding such claims belies their argument that PHRA claims were ever pled.

In its July 16, 2009, Memorandum and Order, the Court, having found that the plaintiffs had not brought PHRA claims, considered whether it was possible for the plaintiffs to amend their pleadings to add such claims.  The Court found that, under Federal Rule 15(b)(2), the plaintiffs could amend their pleadings to add PHRA claims if those claims had been tried "with the express or implied consent of the parties and [if] the opposing party will not thereby be prejudiced."  Evans Prods. Co. v. W. Am. Ins. Co., 736 F.2d 920, 924 (3d Cir. 1984).  The Court found neither express nor implied consent to try PHRA claims here, because neither the plaintiffs' nor the defendant's proposed jury instructions requested the inclusion of a PHRA claim, nor was the possibility of raising such a claim discussed in the parties'

---

[5]    See Order of October 25, 2001 (Docket No. 56 in Case No. 99-1163), denying William McKenna's Motion to Amend (Docket No. 42 in Case No. 99-1163) and accompanying Memorandum of Law (Docket No. 53 in Case No. 99-1163), which contained the proposed amended complaint; see also Order of May 15, 2007 (Docket No. 100 in Case 98-5835, Docket No. 121 in Case No. 99-1163), denying the request to amend raised in the Plaintiff's Brief on the Scope of Issues Remaining for Trial and Motion for Reconsideration (Docket No. 95 in Case 98-5835, Docket No. 114 in Case No. 99-1163).

pretrial memoranda or at the pretrial conference.  The Court also found that allowing an amendment to add PHRA claims after the jury's verdict would prejudice the defendant because it had made litigation and settlement decisions with the understanding that the only claims in the case were Title VII claims subject to the statutory cap.

In their motion for new trial, the plaintiffs argue that the Court erred in not allowing them to amend their pleadings to add a PHRA claim, and they renew their request to amend.  They argue that the parties impliedly consented to try PHRA claims to the jury because evidence presented at trial referred to the plaintiffs' April 29, 1998, complaint filed with the Pennsylvania Human Relations Commission.  The administrative complaint itself was entered into evidence, and several police employees testified concerning their knowledge of its being filed.

The plaintiffs' argument that the admission of this evidence constitutes implied consent to try a PHRA claim is mistaken.  This evidence was admitted because the April 1998 filing of the administrative complaint was one of the protected employment activities for which the plaintiffs alleged they suffered retaliation.  The evidence therefore supported the Title VII claims pled in the complaints and submitted to the jury and

cannot reasonably be construed as the parties' implied consent to try PHRA claims.

The Court finds no error in its prior decision denying the plaintiffs' request to mold the verdict to avoid Title VII's statutory cap and denying the plaintiffs' request to amend their pleadings to add a PHRA claim.

### 3 The Limited Post-Verdict Discovery Concerning Raymond Carnation's Tax Returns

The plaintiffs' claims for compensatory damages were tried to the jury. Plaintiff Raymond Carnation's claims for equitable damages resulting from his termination, including front and back pay, were tried to the Court. Between the jury's verdict and the hearing on equitable damages, the Court permitted both parties to take limited discovery. The plaintiffs contend that allowing this discovery was an abuse of discretion.

After the jury's verdict, the Court held a scheduling conference with counsel to discuss how to address Raymond Carnation's claim for equitable damages. One day after the conference, the defendant moved to compel Carnation to produce tax returns in his possession for the years in which he sought back pay, as well as signed authorizations to obtain those returns from the IRS, and to submit to a deposition. The Court granted the motion in part on June 9, 2008, ordering Carnation to provide returns and authorizations, but deferring a decision on a

deposition until after the returns were received and the defendant could explain the specific questions it wished to ask of Carnation.

On June 11, 2008, the plaintiffs filed a notice with the Court that Carnation had provided the defendant with all tax returns in his possession and with signed authorizations. On August 17, 2008, the plaintiffs moved for permission to depose Deputy Commissioner Jack Gaitens, whom the City had identified as a witness in support of its argument that Carnation's post-termination conviction for marijuana use should cut off his entitlement to back pay. On October 27, 2008, the defendant filed a notice with the Court stating that, as of October 20, 2008, it had received the last of Carnation's tax returns in response to his authorizations, and requesting Carnation's deposition.[6]

On December 18, 2008, the Court granted the requests to depose Carnation and Gaitens. On February 3, 2009, the plaintiffs notified the Court that these depositions had been

---

[6] While the parties were waiting for the IRS to respond to the authorizations and provide Carnation's tax returns, they engaged in extensive motion practice, some of which concerned the pace of discovery. The plaintiffs moved to sanction the defendant for not promptly providing the IRS with Carnation's signed affidavits. The defendant, in turn, moved to sanction the plaintiffs for filing their sanction motion, stating that, contrary to the plaintiffs' representations, it had sent Carnation's authorizations to the IRS within two days of receiving them. The Court denied both sanctions motions.

completed and requested a pre-hearing conference; on February 17, 2009, the City filed a notice agreeing that discovery was complete and a conference should be scheduled. The Court issued an order requiring the parties to file pre-hearing memoranda and motions in limine prior to the conference, which was held on March 17, 2009. At the conference, the Court, with the agreement of counsel for both parties, scheduled the hearing on equitable damages for May 18, 2009. The hearing took place on that date and, on July 7, 2009, the Court issued its decision awarding Carnation back pay in the amount of $208,781.

The plaintiffs make several arguments as to why it was an abuse of discretion for the Court to allow the limited discovery on Carnation's equitable damages. First, they argue that allowing this discovery violated the law of the case doctrine because the Court had previously denied William and Michael McKenna's request to amend their complaints to add wrongful termination claims on the ground that, among other reasons, adding those claims would cause undue delay and prejudice by requiring additional discovery. They contend that having held that additional discovery on the McKennas' terminations would unduly delay the case, the Court could not order additional discovery on Carnation's equitable damages.

This argument misunderstands the law of the case doctrine. That doctrine "directs courts to refrain from re-

deciding issues that were resolved in an earlier stage of litigation," absent a showing of a compelling reason to do so. Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 116 (3d Cir. 1997). It applies when a court is reconsidering the same issue raised earlier or applying the same rule of law earlier determined. See Feesers, Inc. v. Michael Foods, Inc., 591 F.3d 191, 207 (3d Cir. 2010). The doctrine does not apply to the Court's decision here to allow the parties to conduct limited post-verdict discovery on Carnation's equitable claims because the Court had not previously addressed the issue and it, therefore, had not been "resolved at an earlier stage of the litigation."

Although incorrectly couched as an argument concerning the "law of the case," the plaintiffs' essential complaint is that the decision to allow post-verdict discovery was unfair, given the Court's earlier decision to deny the McKennas' request to amend their complaints. The Court does not agree. The Court has already discussed above the reasons for its decision to deny the McKennas' request to amend and has found no error in that decision.

When the Court subsequently granted reconsideration of its decision with respect to Raymond Carnation and allowed him to recover equitable damages, this reopened the issue of additional discovery concerning his claim. Because discovery closed in this

case in 2002, prior to the grant of summary judgment and the subsequent appeal, and because Carnation was seeking equitable damages up through and beyond the 2007 trial on compensatory damages, some additional discovery was necessary, at a minimum, to update Carnation's wage and earnings information for the years 2003 through 2007.

Such additional discovery was taken on both sides. The plaintiffs obtained updated information from the City concerning the salary and benefits that Carnation would have received had he remained a police officer.[7] They also deposed Deputy Commissioner Gaitens concerning the effect Carnation's post-termination marijuana conviction would have had on his continued employment as a police officer. The City obtained additional discovery of Carnation's tax records and took Carnation's deposition.

Permitting this additional discovery was neither unfair to the plaintiffs, nor an abuse of discretion by the Court. Although completing this additional discovery took longer than the Court anticipated, this was not the result of dilatory behavior by either the Court or the parties. The primary delay was the four months between the defendant's providing the IRS with authorizations for Carnation's tax returns and the IRS's producing the last of the returns in its possession.

---

[7]    See the Stipulation of the Parties filed May 18, 2009 (Docket No. 224 in Case No. 98-5835, Docket No. 239 in Case No. 99-1163).

4    The Failure to Enter Final Judgment for William
     and Michael McKenna After the Jury Verdict

The plaintiffs argue that the Court erred by not entering a final judgment in favor of Michael and William McKenna immediately after the jury verdict in their favor.  The Court instead waited until after it had held a hearing and rendered a decision on Carnation's equitable damage claims before entering final judgment as to all three plaintiffs.

The Court addressed this issue in its June 13, 2008, Order denying the plaintiffs' post-verdict motion to enter judgment as to Michael and William McKenna.  The Court noted that, with the agreement of counsel, the claims of all three plaintiffs had been consolidated for trial and tried together to a jury verdict on compensatory damages.  Under Federal Rule of Civil Procedure 54(b), the Court could not enter judgment "as to one or more, but fewer than all, claims or parties" in an action unless the Court "expressly determines that there is no just reason for delay."  The Court found that the Rule applied and that there was a just reason for delaying entry of final judgment as to the McKennas because delay would avoid the risk of duplicative appeals.  The Court found that any appeal from final judgment in favor of the McKennas would likely involve the same issues as any subsequent appeal of final judgment in favor of Carnation.

In their motion for a new trial, the plaintiffs have
not offered any basis for finding the Court's decision to delay
entering final judgment for the McKennas to be erroneous.

The plaintiffs argue that, because the Court ordered
these cases consolidated "for trial," the consolidation should be
deemed to have lasted only until the jury verdict, at which time
the two actions should once again have been considered separate
cases, which would have allowed entry of final judgment as to
Michael McKenna, the plaintiff in Case No. 98-5835. This
interpretation of the consolidation order is not tenable.

At a conference with the parties on December 13, 2007,
the Court raised the question of whether the two cases (Case 98-
5835 brought by Michael Mckenna and Case 99-1163 brought by
William McKenna and Raymond Carnation), which had already been
consolidated for discovery, should be consolidated for trial.
Counsel for the plaintiffs agreed that they should be
consolidated. The plaintiffs' counsel did not indicate that any
consolidation should terminate with the verdict or otherwise
exclude post-verdict proceedings. Based on this discussion, the
Court issued an order on December 14, 2007, consolidating the
cases "for trial." In issuing this order, the Court contemplated
-- and understood the parties to have agreed -- that the
consolidation would encompass the remaining pre-trial
proceedings, the trial itself, and any post-trial motions. Had

the Court intended the order to reflect the plaintiffs' current position that consolidation should have ended with the verdict, the Court would have used different language, consolidating the cases "only for purposes of trial" or "for trial only."

Because the cases remained consolidated after the verdict, the Court could only enter judgment for the McKennas alone if it found no just reason for delay pursuant to Rule 54(b).  The plaintiffs offer no argument that undermines the Court's conclusion that the risk of duplicative appeals constituted a just reason to not enter separate final judgments for the McKennas and for Carnation.  That risk has become more certain now that both sides have filed post-judgment motions that raise issues applicable to all three plaintiffs' claims and that would be duplicative if raised in separate appeals.[8]

---

[8]     In their motion for a new trial, the plaintiffs refer to the decision of the United States Court of Appeals for the Third Circuit in McKenna v. City of Philadelphia, 304 Fed. Appx. 89, 2008 WL 4996621 (3d Cir. 2008).  That decision affirmed this Court's dismissal of William McKenna's second lawsuit, filed in 2006, while this case was on appeal.  See n.2, supra.  In the section of the McKenna opinion describing the procedural history of this case, referred to as "McKenna I," the appellate court commented in a footnote that "We note that McKenna I proceeded to trial and, on May 14, 2008, a judgment of $10 million was entered by the District Court in favor of plaintiffs, including McKenna."  This description was inaccurate, in that only the jury's verdict was entered on May 14, 2008, not a final judgment.  The plaintiffs nonetheless argue that this statement constitutes a "holding" of the appellate court that requires that a final judgment be deemed to have been entered as of that date.  The statement in McKenna is dicta made in a decision in a separate case.  It does not affect the entry of final judgment in this case.

The plaintiffs contend the Court made several errors in calculating Raymond Carnation's award of back pay.  The Court finds no merit to the plaintiffs' arguments.

The Court awarded Carnation over six years of back pay, from his termination on March 12, 1999, through August 30, 2005. The Court cut off back pay as of August 30, 2005, for two reasons.  It found that, as of that date, Carnation had become completely disabled from depression and had never returned to the work force, which served to cut off Carnation's right to back pay under Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1101 (3d Cir. 1995) ("[A]s a general rule, an employment

---

The plaintiffs also state that they were unable to retrieve from the official files of this case the minute sheet for the proceedings held May 14, 2010, the last day of trial and the day the jury returned its verdict.  The plaintiffs state that they wanted to obtain the minute sheet "so they could point [out] to the Court that a judgment was entered by the Court on May 14, 2008, for all plaintiffs in the amount of Ten Million Dollars as found by the Third Circuit."  Pl. Mem. in Support of their Post-Trial Motions at 32.  Although the Court has also been unable to retrieve the minute sheet for May 14, 2010, the transcript of the proceedings held on that date shows unequivocally that no judgment was entered.  After the verdict was published and counsel for the City stated that they would be seeking to impose Title VII's statutory cap on the verdict, the Court stated "I'm just going to leave it as it is, but I'm not going to enter judgment on anything, because we've still got front pay, back pay, and obviously, there is a $300,000 cap.  Okay?"  5/14/08 N.T. at 220.  The plaintiffs' counsel did not object at the time to the Court's statement that it would not be entering judgment, and the Court then adjourned proceedings after stating that it would hold a telephone conference within two weeks to discuss how to proceed on the remaining issues.

discrimination plaintiff will not be allowed back pay during any periods of disability") (internal quotation and brackets omitted); see also N.L.R.B. v. Louton, Inc., 822 F.2d 412, 415 (3d Cir. 1987) ("An employer is not generally liable for back-pay for periods when an employee is unavailable for work due to a disability."). The Court also found that, as of that same date, Carnation had withdrawn from all participation in the workforce and thereby cut off his right to back pay for failure to mitigate his damages. See Tubari Ltd., Inc. v. N.L.R.B., 959 F.2d 451, 454 (3d Cir. 1992) ("[A]n employer meets its burden on the mitigation issue by showing that the employee has withdrawn from the employment market."). The plaintiffs argue both of these findings were erroneous.

The plaintiffs allege that the Court improperly found Carnation to be disabled based on his entitlement to Social Security disability benefits. Carnation applied for Social Security disability benefits in 2008 and was awarded them retroactively from August 30, 2005, the date upon which the Social Security Administration ("SSA") found Carnation to have become completely disabled. The plaintiffs argue that by relying on the SSA's finding of disability to cut off Carnation's right to back pay, the Court was improperly using his Social Security benefits to reduce his damage award.

The plaintiffs are correct that Social Security payments cannot be used to offset an award of back pay. <u>Maxfield v. Sinclair Int'l</u>, 766 F.2d 788 (3d Cir. 1985). The Court, however, did not use Carnation's Social Security award as an offset. Instead, it considered the award only as evidence of Carnation's disability. The Court did not consider the SSA's finding to be conclusive, but evaluated it along with Carnation's own testimony concerning the extent of his depression.

This distinction between the use of Social Security benefits for these two different purposes is expressly recognized in <u>Maxfield</u>. In <u>Maxfield</u>, an age discrimination case, the district court allowed the defendant to introduce evidence of the plaintiff's Social Security retirement benefits at the damages phase of the trial for the limited purpose of showing that the plaintiff had not used his best effort to mitigate his damages. The district court refused, however, to use the Social Security benefits as a set off to the plaintiff's damages. The appellate court affirmed, finding that the collateral source rule prevented the plaintiff's Social Security benefits from being used to offset his damages, but found no error in the fact that the defendant "was permitted to, and did, argue to the jury," based on those benefits, "that [the plaintiff] was better off after his forced retirement." <u>Id.</u>, 766 F.2d at 795. Here, the Court used evidence of Carnation's Social Security disability benefits for

the similar purpose of determining if and when Carnation became completely disabled and was no longer entitled to back pay.

The plaintiffs also challenge the Court's terminating Carnation's back pay based on his withdrawal from the work force as of August 30, 2005. The plaintiffs do not challenge the Court's factual finding that Carnation completely withdrew from the workforce on that date, which was based on Carnation's testimony that he had submitted no applications for employment to any employer after being discharged from Temple University in August 2005 through the May 2009 hearing on his equitable damages. Instead, the plaintiffs challenge the legal basis for using Carnation's withdrawal from the work force to cut off his right to back pay.

In using Carnation's failure to look for work to cut off his back pay, the Court relied on Tubari Ltd., Inc. v. N.L.R.B., which held that an employer could show that an employee had failed to mitigate his damages by showing that the employee had "withdrawn from the employment market." 959 F.2d at 454. Tubari, however, was not an employment discrimination case. It involved workers illegally discharged in violation of the National Labor Relations Act ("NLRA"). The plaintiffs argue that Tubari is therefore inapplicable to this case and that Carnation's failure to look for any employment after August 2005 should not prevent him from receiving back pay.

43

The plaintiffs are incorrect.  The reasoning of
Tubari applies to Title VII claims like this one.  The NLRA was
the model for Title VII's back pay provision.  Maxfield, 766 F.2d
at 793.  Under both statutes, a plaintiff is not entitled to back
pay to the extent that a defendant can establish a failure to
mitigate damages.  Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32
(1982) (Title VII); Tubari, 959 F.2d at 453-54 (NLRA).  Under
both statutes, an employer can show failure to mitigate by
establishing that there was available work that was substantially
equivalent to that previously held by the plaintiff and that the
plaintiff failed to exercise reasonable diligence to obtain it.
Le v. Univ. of Pa., 321 F.3d 403, 407 (3d Cir. 2003) (Title VII);
Tubari, 959 F.2d at 454 (citing Phelps Dodge Corp. v. NLRB, 313
U.S. 177, 198-200 (1941)) (NLRA).  The Tubari court also held
that a defendant under the NLRA could show a failure to mitigate
by establishing that the plaintiff "has withdrawn from the
employment market."  Id., 959 F.2d at 454.

Because of the similarity between the back pay
provisions of NLRA and Title VII, courts in this district have
consistently applied Tubari's holding to employment
discrimination cases.  See, e.g., Tomasso v. Boeing Co., 2007 WL
2458557 at *3 (E.D. Pa. Aug. 24, 2007) (holding that a defendant
can establish failure to mitigate by showing that the employee
has withdrawn from the employment market, citing Tubari);

44

Holocheck v. Luzerne County Head Start, Inc., 2007 WL 954308 at
*14 (M.D. Pa. Mar 28, 2007) (following Tubari in an ADEA case and
denying back pay to a plaintiff who completely withdrew from the
labor market); see also Caufield v. Center Area School Dist., 133
Fed. Appx. 4 (3d Cir. 2005) (not precedential) (holding, in an
ADEA case, that a defendant could prove a failure to mitigate
either by proving that other substantially equivalent positions
were available to the plaintiff and she failed to use reasonable
diligence in attempting to secure them or that the plaintiff
"withdrew entirely from the employment market," citing Tubari).
The Court finds no error in similarly applying Tubari here.

        The plaintiffs argue that, even if the Court properly
found that as of August 30, 2005, Carnation had become completely
disabled and had completely withdrawn from the work force, those
findings should not serve to cut off his back pay award because
both his disability and his withdrawal from the work force were
the result of depression caused, at least in part, by the
defendant's wrongful acts.  The plaintiffs argue that, in light
of the verdict for Carnation, the jury necessarily found, as
Carnation contended at trial, that the City's retaliatory actions
exacerbated his depression and caused him to suffer severe
emotional distress.  The plaintiffs contend that this finding
binds the Court in awarding equitable damages and that it was
error for the Court to find that Carnation's disability and

withdrawal from the work force were not related to the City's actions.

The Court addressed this issue in its July 7, 2009, Memorandum and Order. The Court acknowledged that neither Carnation's complete disability nor his withdrawal from the workforce would cut off his entitlement to back pay if those actions could be attributed to the City's wrongful discrimination or retaliation. See Starceski, 54 F.3d at 1101 ("[A]n employer who has discriminated need not reimburse the plaintiff for salary loss attributable to the plaintiff and unrelated to the employment discrimination"). The Court recognized that, as implicitly found by the jury, Carnation's depression was exacerbated by the City's wrongful acts.

Based on this recognition, the Court rejected the City's after-acquired evidence defense, in which the City argued that Carnation's post-termination 2001 conviction for marijuana possession would have required his termination had he remained a police officer and therefore should cut off his right to back pay. The Court found, based on Carnation's testimony and the facts presented as to his conviction, that Carnation's use of marijuana, a one-time event occurring within a year and a half of his termination from the police department at a time when he was still suffering from depression, was sufficiently causally

related to the City's retaliation that it would be inequitable to cut off Carnation's back pay as a result of the conviction.

The Court, however, rejected the plaintiffs' argument that Carnation's disability and withdrawal from the work force in August 2005 was similarly caused by depression attributable to the City's retaliation.  After Carnation's 1999 termination from the police department and his September 2000 arrest and 2001 conviction for marijuana possession, Carnation held several jobs and was employed as an orderly at Temple University for over three years until he was terminated in August 2005.  The Court found that this intervening period of sustained employment established that the City's actions did not prevent Carnation from obtaining employment or cause him to become completely disabled.  The Court concluded that whatever happened in 2005 to cause Carnation's depression to intensify and cause him to become completely disabled was not related to the defendant's actions six years earlier.  The plaintiffs' motion for a new trial provides no basis for the Court to reconsider this conclusion.[9]

---

[9] The plaintiffs also challenge the Court's finding that Carnation had not established that he was entitled to an additional recovery for the "buy back" value of unused sick, vacation, and holiday time.  Carnation established that the City of Philadelphia allowed police officers to "bank" unused time and, if that time remained unused at retirement or termination, the City would buy that time back from the officer.  Carnation argued that, to the extent he was awarded back pay, he should also be awarded an additional amount representing the "buy back" value of all the sick, vacation, and holiday time that he would have accrued during the back pay period, based on his assertion

After the entry of final judgment for the plaintiffs,
the City moved to stay execution of the judgment pending post-
judgment motions and appeal.  The City also requested that the
stay be entered without requiring a supersedeas bond.  The Court
granted the motion on July 30, 2009.  The Court found that the
City was entitled to a stay of execution pending disposition of
the parties' post-trial motions under Federal Rule of Civil
Procedure 62(b) and entitled to a stay pending appeal under Rule
62(d).  The Court found that, although a bond would ordinarily be
required to obtain either stay, a bond was not required in this
case.

The Court found that the City did not have to post a
bond pending appeal under Federal Rule of Civil Procedure 62(f),
which provides that, "[i]f a judgment is a lien on the judgment
debtor's property under the law of the state where the court is

---

that he would not have taken any time off had he remained on the
police force.  The Court rejected any award for "buy back" time,
finding that the stipulated damage figures submitted by the
parties already included a value for fringe benefits and that any
additional award could only be based on speculation as to how
much time Carnation would actually have "banked" at the time he
eventually left the department.  In their motion for new trial,
the plaintiffs argue that these damages are not speculative
because the Court must presume that Carnation would have banked
all his sick, holiday, and vacation time.  The plaintiffs offer
no authority for this claimed presumption, and the Court finds no
error in its decision to decline to award damages for banked
time.

located, the judgment debtor is entitled to the same stay of execution the state court would give." The Court found that, under Pennsylvania law, the plaintiffs' judgment would be a lien on the City's property under 42 Pa. C.S. § 4303(a), and that, as a political subdivision, the City of Philadelphia was not required to file a supersedeas bond to obtain a stay pending appeal under Pa. R. App. P. 1736(a)(2).

The Court found Pennsylvania law to be unclear as to whether the City's exemption from filing a bond applied not just to the pendency of the appeal, but also to the pendency of post-judgment motions. Rather than decide the issue of state law, the Court found that it had discretion to decline to order the City to post a bond for a stay pending a decision on post-judgment motions under Federal Rule of Civil Procedure 62(b). That Rule provides that a stay of execution pending post-judgment motions can be made "[o]n appropriate terms for the opposing party's security." Relying on an affidavit from the City's Budget Director that stated that the City had appropriated $24,500,000 to pay settlements and judgments for the fiscal year beginning July 1, 2009, the Court found that the appropriation provided "appropriate terms" to secure the plaintiffs' $1,155,341 judgment during the pendency of post-judgment motions, without requiring a bond.

In its motion for new trial, the plaintiffs challenge the decision to stay execution of the judgment without a bond. The plaintiffs do not specifically address the Court's application of Federal Rule 62 or its interpretation of Pennsylvania law. Instead, the plaintiffs argue that they had a property right in their judgment and that, by staying execution of the judgment, the Court "took the Plaintiffs' money" and deprived them of their property without due process.[10] They further argue that the Court improperly accepted the affidavit of the City Budget Director without providing the plaintiffs with an evidentiary hearing or a meaningful opportunity to challenge the affidavit.

The Court finds no merit to the plaintiffs' arguments. The Court issued a stay of execution in accordance with the Federal Rules of Civil Procedure, applying Pennsylvania's exemption of political subdivisions from the requirement of filing a supersedeas bond for appeal. The affidavit of the City Budget Director was filed with the City's brief, to which the plaintiffs had an opportunity to respond. The Court considered the affidavit only for the purpose of imposing the stay for the period of time between the issuance of judgment and the pendency of the appeal. In doing so, the Court considered the arguments

---

[10]     Plaintiffs' Memorandum in Support of their Post-Trial Motions at 69.

raised by the plaintiffs in their opposition brief and found that they did not raise sufficient factual disputes to warrant an evidentiary hearing.

B.    The Defendant's Post-Judgment Motions

The defendant City of Philadelphia has moved for judgment as a matter of law as to certain claims brought by Raymond Carnation and Michael McKenna.  If judgment is granted on these claims, the City contends that a new trial on damages will be necessary on all Carnation and Michael McKenna's remaining claims.

The City has also moved for a new trial as to all three plaintiffs on all issues.  The City contends that improper statements by the plaintiffs' counsel caused the jury's verdict to be swayed by passion, prejudice, and confusion.  The City also contends that the verdict was against the weight of the evidence. In the alternative, for this same reason, the City seeks a remittitur of the verdict to an amount of $75,000 per plaintiff.[11]

_____

[11]    The plaintiffs contend that both of the City's post-judgment motions are untimely.  The City's (and the plaintiffs') post-judgment motions were filed within 28 days fo the Court's July 24, 2009, entry of judgment, as required by Fed. R. Civ. P. 50(b) and 59(b).  The plaintiffs' argument that the motions are untimely is based on their incorrect contention that the entry of judgment occurred on the date of the verdict, which the Court has addressed above at n.8, supra.

1.  <u>The Motion for Judgment as a Matter of Law</u>

The City argues that it is entitled to judgment as a matter of law on three of the plaintiffs' retaliation claims: Michael McKenna's claim concerning his assault by a fellow police officer, Raymond Carnation's claim concerning Captain Colarulo's involvement in his child custody dispute, and Raymond Carnation's claim concerning his termination. The City moved at trial for judgment on these claims at the close of the plaintiffs' case. 5/13/08 N.T. at 127-31. The Court reserved its decision and submitted the claims to the jury, which returned a verdict on all claims in the plaintiffs' favor.

In considering a motion for judgment as a matter of law, the Court must decide whether, "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." <u>Eshelman v. Agere Systems, Inc.</u>, 554 F.3d 426, 433 (3d Cir. 2009). The question for the Court is "not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict." <u>Id.</u> (quoting <u>Gomez v. Allegheny Health Servs., Inc.</u>, 71 F.3d 1079, 1083 (3d Cir. 1995) (internal quotations and citations omitted). In answering this question, the Court "must refrain from weighing the evidence,

determining the credibility of witnesses, or substituting [its] own version of the facts for that of the jury."  <u>Marra v. Phila. Hous. Auth.</u>, 497 F.3d 286, 300 (3d Cir. 2007).

a    <u>Michael McKenna's Claims Relating to his Assault</u>

One of the issues presented to the jury was whether unlawful retaliation by the City was responsible for Michael McKenna's being assaulted by a fellow police officer on February 14, 1998, after Sergeant Moroney allegedly threatened to "kick [Michael's] ass."  Order of May 1, 2008 (Docket No. 131 in Case 98-5835; No. 150 in Case No. 99-1163).  The City contends that there was insufficient evidence presented to the jury to allow it to reasonably find that Michael McKenna's assault was instigated by Moroney or that Moroney's actions were motivated by retaliatory animus.  The key testimony concerning the assault was given by Michael McKenna, Sergeant Moroney, and Officer Seeger.

On direct examination, Michael McKenna testified that, after roll call on the evening of February 14, 1998, while getting a battery for his radio, he overheard several officers in the 5th squad room, including Officer Paul Seeger and Officer Walt Szamatowicz, saying, "[D]id you hear that Sgt. Moroney was gonna go kick Bill McKenna's ass."  He heard Officer Szamatowicz reply, "Well, he's not the only one that's gonna kick Bill McKenna's ass."  McKenna then approached Sergeant Moroney and

53

asked to talk, and Moroney and McKenna went to an area near the women's bathrooms. McKenna then told Moroney what he had overheard, and Moroney responded "Yes, I did say I was gonna kick Bill McKenna's ass, your brother Bill's ass, and if I would have seen him yesterday I would have kicked his ass." After that conversation, McKenna went upstairs to the operations room and Sgt. Moroney went into the 5th squad room where the officers who made the comments were. 5/7/08 N.T. at 30-34.

Michael McKenna testified that he then ran into his brother, William, in the operations room and told him that "Sgt. Moroney said he's gonna kick your ass, now he's saying that he's gonna kick my ass." Michael McKenna then began to walk out of the building, and as he was doing so, Officers Szamatowicz ran up to him and began a verbal altercation. As they were speaking, Officer Seeger came up, called McKenna a vulgarity, and pushed him off the step that he was on, causing McKenna to injure his hand. McKenna testified that Moroney was not present during the incident, but that he came running up afterwards and began screaming at him, telling him that he was causing trouble and would be written up. Moroney told McKenna to go home and McKenna subsequently went to the hospital where his hand was placed in a cast. 5/5/08 N.T. at 34-39, 41-42.

On cross-examination, Michael McKenna admitted that Sergeant Moroney did not tell Officer Seeger to attack him, but

said he "believed [Moroney] instigated it." Asked if he believed
Officer Seeger assaulted him on his own, McKenna said that "[h]e
did it on his own after being instigated, I believe." McKenna
admitted that, in his deposition given February 2002, when asked
if he thought Moroney told Seeger to assault him, he responded,
"No, that's something that Seeger did on his own." 5/7/08 N.T.
99-102.

Sergeant Moroney was called as a witness in the
plaintiffs' case. He testified that Michael McKenna approached
him after roll call on February 14, 1998, and asked to talk. He
said that, although he had never said that he wanted to "kick
[William McKenna's] ass," he did make it known that he was
looking for William McKenna and wanted to confront him. He added
that, after this conversation, Michael McKenna went to the
operations room and Moroney went to the squad room. Moroney
testified that neither Seeger nor Szamatowicz were in the squad
room when he entered, although Szamatowicz may have been there
later. He testified that he left the squad room for the
operations room because of a disturbance. He saw a number of
people in the hallway and was told by Michael McKenna that
Szamatowicz had gotten "in his face" and "hollered" at him and
then left the station. Moroney then left the station to find
Szamatowicz and spoke to him on the sidewalk. He then heard a
"commotion" inside and went back inside where he found that

Seeger and Michael McKenna had had an altercation. 5/9/08 N.T. at 53-63.

Officer Seeger testified in the defendant's case. His version of the incident was that he had been talking to another officer about William McKenna's being disciplined earlier that day and said something like "which jerkoff started this one," when Michael McKenna came up and confronted him. He and McKenna exchanged words and Michael McKenna "placed his left hand on my right wrist," after which several officers separated them. Seeger testified that he had not spoken to Moroney that day and that Moroney never gave him any signal or indication that he wanted something done to Michael McKenna. 5/13/08 N.T. at 12-13.

The City contends that Michael McKenna's testimony is insufficient for the jury to find that Sergeant Moroney instigated the altercation between Officer Seeger and Michael McKenna. The City describes as "undisputed" Officer Seeger's testimony that he acted on his own because it accords with Michael McKenna's 2002 deposition testimony that Seeger acted "on his own" and is not contradicted by McKenna's trial testimony in which McKenna admitted that Moroney did not tell Seeger to attack him but that he "believed" Moroney instigated the incident.

In evaluating the sufficiency of the plaintiffs' evidence, the Court is mindful of the earlier appellate decision in this case: Moore v. City of Philadelphia, 461 F.3d 331 (3d

Cir. 2006).  In <u>Moore</u>, the United States Court of Appeals for the Third Circuit found that the summary judgment record contained sufficient evidence for a reasonable jury to conclude that Michael McKenna's assault was caused by retaliatory animus on the part of Sergeant Moroney.  The appellate court described the relevant evidence as Michael McKenna's hearing "Moroney threaten that he would 'kick [Michael's] ass' and 'kick [William's] ass'" and the fact that "[f]ifteen minutes later, Michael was assaulted by a fellow police officer."  Although the <u>Moore</u> court recognized that "a fellow officer assaulted McKenna, rather than Moroney himself," it found that a jury could reasonably conclude that Moroney instigated the assault because there was "evidence to suggest that [Moroney] openly endorsed the assault to a squad that already deeply disliked the victim and the assault occurred 15 minutes later."  <u>Id.</u>, 461 F.3d at 347 n.7.

The same evidence found sufficient in <u>Moore</u> was presented to the jury here.  Michael McKenna testified that he overheard Officers Seeger and Szamatowicz talking about Moroney threatening to kick his brother's ass and that Moroney subsequently admitted to him that he had said it.  He also testified that, after his conversation with Moroney, he told his brother that Moroney was now threatening to kick both his and his brother's ass.  Both McKenna and Moroney testified that, after

their conversation, Moroney went into the squad room, and McKenna testified that both Seeger and Szamatowicz had been in the squad room before he and Moroney began their conversation. Both Michael McKenna and Moroney's testimony agreed that, within a short time after their conversation, Seeger and McKenna had their altercation.

At summary judgment, the Moore court found that, viewing these facts in the light most favorable to the plaintiffs, a reasonable jury could infer from them that Seeger's assault was instigated by Sergeant Mooney. The Court must apply a substantially identical standard in deciding the City's motion for judgment as a matter of law on this same issue. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000) ("[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'") (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251 (1986)). The Court must draw all inferences in favor of the plaintiffs and cannot make credibility determinations or weigh the evidence. Id.

In light of Moore, and because the Court finds no significant difference between the facts presented on this issue at summary judgment and those presented at trial, the Court concludes that the plaintiffs presented sufficient evidence to support the jury's finding that Sergeant Moroney instigated

58

Officer Seeger's assault on Michael McKenna because of retaliatory animus and that the City was therefore liable for the assault.

### b    Raymond Carnation's Claims Relating to his Custody Dispute

The City challenges the sufficiency of the evidence to establish that Captain Colarulo's involvement in Raymond Carnation's custody dispute in the summer of 1998 was motivated by retaliatory animus.

The plaintiffs' evidence on this issue came from the testimony of Raymond Carnation and Captain Colarulo. Raymond Carnation testified that he was involved in a custody battle with an ex-girlfriend in 1998 over the custody of their daughter. He testified that the police department became involved in that dispute in early July when Lieutenant Bachmayer went to his ex-girlfriend's house, picked her up, and took her to be interviewed by Captain Colarulo. Carnation testified that, before that incident, no one in the department to his knowledge had done anything to become involved in his custody dispute. 5/7/08 N.T. at 229-31.

Captain Colarulo testified that, sometime between Carnation's transfer out of the 25th District after Memorial Day and his subsequent assignment to the autopound in July 1998, he

was contacted by Carnation's ex-girlfriend, Robin Kelly. Colarulo testified that Kelly told him that she was having on-going problems with Carnation. Colarulo said that he cautioned her that he had to be "careful with [his] involvement with her" because he believed that Carnation was going to file "some kind of an action" against him and he did not "want to make it look like retaliation by assisting her." Colarulo testified that Kelly then told him that "that explains what [Carnation] told [her] several weeks ago" when he said that, if Colarulo called, Kelly should say that "everything is okay and that [Carnation] would buy her a house next year when he got the money from his lawsuit." Kelly also told Colarulo that Carnation was threatening her and was threatening to kidnap their child. 5/8/10 N.T. 179-82.

Colarulo testified that he then arranged for Kelly to be transported to the 25th District so that he could interview her about her statement that Carnation would buy her a house if she told Colarulo that everything was okay. After he interviewed her, Colarulo had her transported to the northeast detective division to report Carnation's threats. He said that he told her that he would attempt to get her help. 5/8/10 N.T. 181-82.

Colarulo testified that, prior to this incident, Kelly had called both him and other supervisors a number of times in the past. He testified that, on these prior occasions, he had

60

never had Kelly transported to the 25th District to be interviewed.   After this incident, Kelly continued to call Colarulo and had called him as recently as three or four months before the May 2008 trial, looking for his help and telling him that no one else could help her.   Colarulo testified that officers in the northeast division had had numerous encounters with her and Carnation over the years concerning "domestic violence issues."   5/8/10 N.T. 180, 183.

The City argues that the testimony of Carnation and Colarulo is not enough to allow the jury to conclude that his reaction to Kelly's calls was motivated by illegal retaliation. The plaintiffs argue that this evidence was found sufficient in Moore.   The evidence presented at trial, however, differs from the summary judgment record that was evaluated in Moore.

The Moore court describes the evidence concerning Colarulo's intervention in Carnation's custody matter as:

> During the summer of 1998, Colarulo also intervened in Carnation's child custody dispute with the mother of his child.   The mother of his child said that when she first contacted Colarulo in January of 1998, Colarulo was reluctant to become involved. However, in the summer of 1998, she received "a different response" as "she was welcomed to talk to him, as [Colarulo] indicated to her that he would do anything to help her and her daughter." . . . Colarulo pressed the mother for information about whether Carnation was drinking, did drugs, or had heard of his recent hospitalization.

461 F.3d at 340.  At trial, the plaintiffs did not present testimony from Robin Kelly.  No testimony was presented at trial that Colarulo was "reluctant" to become involved in Carnation's custody prior to the summer of 1998 or that he subsequently indicated to Kelly that "he would do anything to help her and her daughter."  There was also no evidence presented that Colarulo pressed Kelly for information about Colarulo's drinking, drug use, or hospitalization.

Despite the differences between the summary judgment record and the trial record, the Court believes that Moore's reasoning requires the conclusion that the evidence presented at trial was sufficient for a jury to find retaliatory animus.  The Moore court concluded that the summary judgment record "is susceptible of the interpretation that Carnation was falsely disciplined for attempting to contact his supervisors on Memorial Day weekend and that Colarulo thereafter became involved in Carnation's custody battle with the mother of his child."  461 F.3d at 348.  The Moore court found that a reasonable jury "might well conclude that this pattern of harassment might dissuade a reasonable worker from bringing or supporting a charge of discrimination."  Id.

The evidence presented at trial shows the same "pattern of harassment" found sufficient in Moore.  Like the evidence in the summary judgment record, the evidence at trial is

"susceptible to the interpretation" that Captain Colarulo's response to Robin Kelly's complaints changed after he became aware that Carnation might bring an action against him. In handling Kelly's previous calls, Colarulo had never arranged to have her transported anywhere, but in response to this call, he arranged to have Kelly brought to the district for an interview and, afterwards, had her transported to the northeast division to be interviewed concerning her allegations against Carnation. Colarulo admitted telling Kelly that he would attempt to get her help and admitted that, even years after the incident at issue, she still looks to him for assistance in her disputes with Carnation.

Because the Court finds that the evidence presented at trial is not significantly different from that considered in Moore, and because Moore found such evidence sufficient to support a claim of retaliation based on Captain Colarulo's involvement in Carnation's child custody issues, the Court will deny the City's motion for judgment as a matter of law on this issue.

### c. Raymond Carnation's Claims Relating to his Termination

The City seeks judgment as a matter of law on Raymond Carnation's claim that his termination from the Philadelphia police department was the result of unlawful retaliation. The

City contends that, although Carnation was terminated as a result of disciplinary proceedings brought by Captain Colarulo, the plaintiffs cannot establish the requisite causal link between the termination and Colarulo's alleged retaliatory animus because the recommendation to terminate was made by an independent Police Board of Inquiry ("PBI").[12]

Very little testimony was offered at trial by either side about the PBI's involvement in Carnation's termination. The basic facts, however, were not disputed. Carnation was brought up before the PBI on disciplinary charges filed by Captain Colarulo. Colarulo charged Carnation with two counts of insubordination and one count of neglected duty stemming from Carnation's actions over the weekend of Memorial Day 1998. The PBI, consisting of a three-officer panel, held a hearing on January 19, 1999, at which Carnation was represented by counsel and testified on his own behalf. The PBI was charged with evaluating the evidence presented, rendering a decision, and recommending a punishment. The PBI board upheld the charges filed by Colarulo, added an additional charge of conduct unbecoming an officer, and recommended that Carnation be

---

[12] Unlike the other claims for which the defendant seeks judgment as a matter of law, Carnation's claim concerning his termination was not addressed in the Moore decision, which does not mention the termination in its discussion of the allegedly retaliatory actions taken against Carnation. See Moore, 461 F.2d at 339-40, 348.

terminated.  No evidence was presented at trial to suggest that the officers on the PBI had any retaliatory animus toward Carnation or even that they knew that Carnation had engaged in protected activity.  5/7/10 N.T. at 188, 215, 235-36, 5/8/10 N.T. at 178, 5/13/10 N.T. at 108, 138.

Because no evidence was presented at trial to show that the members of Carnation's PBI knew of his EEOC complaint or any other of his protected activities, the jury had no basis to find that the PBI, itself, was motivated by retaliation.  See Moore, 461 F.3d at 351; Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decision-makers must be aware of the protected conduct").

Under certain circumstances, however, the retaliatory animus of a non-decisionmaking employee like Captain Colarulo can be imputed to an otherwise unbiased decision-maker.  Such an imputation is not automatic.  See Moore, 461 F.3d at 351 (noting that evidence of retaliatory intent on the part of Captain Colarulo could not reasonably be imputed to the entire police department and holding, therefore, that William and Michael McKenna could not bring claims concerning adverse actions taken after they were transferred out of the 25th District unless they could show "an independent basis for the inference of retaliatory animus").

Courts have reached different conclusions about the circumstances that will justify imputing another employee's animus to the ultimate decision-maker. There is general agreement in the federal courts that a plaintiff can establish liability by showing that a decision-maker did nothing more than "rubber stamp" a recommendation made by an employee motivated by unlawful animus or that a decision-maker was acting as an unwitting dupe or "cat's paw" for such an employee. See EEOC. v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 484-85 (10th Cir. 2006) (collecting cases). Circuit courts have disagreed, however, whether liability can be imposed when a biased non-decision-maker exercises a lesser degree of control or input concerning an employment decision.

At one extreme, the United States Court of Appeals for the Fourth Circuit has refused to extend liability beyond the "cat's paw" or "rubber stamp" paradigms to cases in which a biased employee exercises substantial influence over an employment action, but is not the actual decision-maker:

> [W]e decline to endorse a construction of the discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision.

Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 291 (4th Cir. 2004).  Other circuits have declined to adopt this restrictive interpretation and have adopted different approaches, allowing a plaintiff to recover upon a showing that a non-decision-maker's bias "caused" the adverse decision or "substantially influenced" or "tainted" it.  See BCI Coca-Cola, 450 F.3d at 487 (describing Hill's focus on identifying the actual decision-maker as "misplaced" and holding that, to establish liability, a plaintiff must show that the influence or input of a biased non-decision maker "caused the adverse employment action"); Lust v. Sealy, Inc., 383 F.3d 580, 584-85 (7th Cir. 2004) (describing Hill's approach as "inconsistent with the normal analysis of causal issues in tort litigation" and affirming earlier decisions holding that liability could be established by showing that an adverse decision was "substantially influenced" or "tainted" by a non-decision-maker's bias).

The United States Court of Appeals for the Third Circuit has not directly addressed the split on this issue among the courts of appeal.  It has, however, described its own decisions as allowing plaintiffs to recover if they can show that a biased non-decision-maker "influenced or participated" in the adverse employment decision.  Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 286 (3d Cir. 2001) ("Under our case law,

it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate.") (citing <u>Abrams v. Lightolier Inc.</u>, 50 F.3d 1204, 1214 (3d Cir. 1995)).

In <u>Abramson</u>, a professor contended that she had been terminated from her university because the chair of her department and the dean of her school harbored religious prejudice against her.  Both the dean and the department chair had refused to recommend that the plaintiff be retained as a professor, but it was undisputed that the ultimate decision to terminate her had been made by the university president.  The district court granted the defendants summary judgment on the plaintiff's termination claim, in part, because there was no evidence in the record to show that the president possessed discriminatory animus toward the plaintiff.  The court of appeals reversed, finding that the record would allow a jury to find that the dean and department chair harbored discriminatory animus and that they "influenced" the president's decision.  Because the dean and the department chair "played a role" in the ultimate decision to terminate the plaintiff, the evidence of their discriminatory animus was sufficient to warrant reversal of summary judgment.  <u>Id.</u>, 260 F.3d at 285-86.

The City never mentions <u>Abramson</u> in arguing for judgment as a matter of law on Carnation's termination claim.

Instead, the City cites the Fourth Circuit decision in <u>Hill</u> and a non-precedential decision from this circuit, <u>Foster v. New Castle Area Sch. Dist</u>, 98 Fed. Appx. 85, 88 (3d Cir. April 16, 2004). <u>Foster</u>, without mentioning <u>Abramson</u>, cites <u>Hill</u> with approval for the proposition that "an employer will be liable not for the improperly motivated person who merely influences a decision, but for the person who in reality makes the decision."

Neither <u>Hill</u> nor <u>Foster</u> is binding precedent in this Court. <u>See</u> <u>Jamison v. Klem</u>, 544 F.3d 266, 278 n.11 (3d Cir. 2008). Moreover, both the holding in <u>Hill</u> and the statement in <u>Foster</u> directly contradict <u>Abramson</u>'s holding that animus can be imputed to a decision-maker on the basis of a prejudiced employee's influence into the ultimate decision. As a precedential decision, <u>Abramson</u> binds this Court and determines what showing the plaintiffs must make to establish that Colarulo's animus motivated the PBI's termination decision.

The City also relies on another decision from outside this circuit to argue that, because Carnation was permitted to give his version of events at the PBI hearing, the jury could not reasonably have found that the PBI's termination decision was influenced by Colarulo. The City quotes <u>English v. Colo. Dep't of Corrections</u> as holding that "[a] plaintiff cannot claim that a firing authority relied uncritically upon a subordinate's prejudiced recommendation where the plaintiff had an opportunity

to respond and rebut the evidence supporting the recommendation."
248 F.3d 1002, 1011 (10th Cir. 2001).[13]

English, however, is not the law in this circuit and is
implicitly rejected by Abramson.  Like the plaintiff in English,
the Abramson plaintiff was given the opportunity to respond to
the allegedly biased information presented to the ultimate
decision-maker in her case.  After the Abramson plaintiff was not
recommended for retention by her allegedly prejudiced dean, she
wrote the university president challenging the dean's decision
and accusing her of prejudice, and after the university president
also recommended that she not be retained, the Abramson plaintiff
went through a university appeals process.  Id., 260 F.3d at 272.
Although the plaintiff had these opportunities to respond to and
rebut the evidence supporting the allegedly prejudiced
recommendations, the Abramson court nonetheless held that a
rational jury could find that the recommendations "played a role"
in the university president's decision and therefore allowed the

---

[13]     In English, an African American corrections officer
alleged that his termination for allegedly having sexual
relations with an inmate was a pretext for racial discrimination
and that his employer's investigation into the incident was
conducted in a racially biased manner.  The English court upheld
the grant of summary judgment to the employer, holding that even
if the court accepted the plaintiff's allegation that the
investigation was racially biased, the decision to terminate was
made by an administrator who gave the plaintiff an opportunity to
present evidence rebutting the investigator's findings.  Id., 248
F.3d at 1004-06, 1011.

recommenders' prejudice to be imputed to the ultimate decision-maker.  Id., 260 F.3d at 286.

Applying Abramson here, the Court finds that the plaintiffs presented sufficient evidence for the jury to have found that Carnation's termination was the result of retaliation. The plaintiffs presented evidence from which a reasonable jury could have found both that Captain Colarulo harbored retaliatory intent toward Carnation and that this intent had a substantial influence on the PBI's decision to recommend that Carnation be terminated over his actions surrounding Memorial Day 1998.

Carnation testified that Colarulo made a direct threat to retaliate against him.  He testified that, in a meeting on February 6, 1998, at which Carnation, Colarulo, Lieutenant Bachmayer, and Sergeant Moroney were present, Colarulo said he would make Carnation's life a "living nightmare" if he filed an EEOC complaint.  Colarulo and Moroney gave a different description of the February 6 meeting in their testimony, both testifying that Colarulo offered to call the EEOC himself if Carnation felt that Moroney was being unfair.  The jury, however, was entitled to believe Carnation and find that the threat was made.  Carnation filed an EEOC complaint, along with other officers, on April 29, 1998, approximately two months after the threat and one month before the Memorial Day incident for which

he was terminated.  5/7/08 N.T. at 175-79; 5/9/08 N.T. at 38-39;
5/13/08 N.T. at 93.

In their trial testimony, Colarulo and Carnation gave
conflicting versions of the Memorial Day incident.  Both agreed
that, at Carnation's request, Colarulo spoke with Carnation on
the Thursday before Memorial Day and discussed Carnation's
relationship with Sergeant Moroney.  Carnation testified that
Colarulo told him that, if he had difficulties with Moroney, he
should speak with him directly.  In contrast, Colarulo testified
that Carnation asked to have a meeting with him and Moroney and
that he responded by saying that any initial meeting should not
include Moroney and by instructing Carnation to contact his aide
to arrange the meeting.  5/7/08 N.T. at 180-81, 210-11; 5/8/08
N.T. at 161-64; 5/13/08 N.T. at 105-06.

It is undisputed that the Friday before Memorial Day,
Carnation, who at this time was out on extended leave, called the
25th District at least twice asking to speak to Sergeant Moroney.
Testimony differed as to the specifics of the messages Carnation
left at the district on Friday.  Carnation testified that he
asked to speak with Moroney.  Colarulo testified that he learned
from Moroney that Carnation had said that Colarulo wanted Moroney
to set up a meeting with Carnation and to have an officer take
Carnation's paycheck to his house.  Colarulo testified that he
told Moroney that both statements were false and that Moroney was

72

not to call Carnation back.[14]  Instead, Colarulo called Carnation
and told him not to call Moroney again.  Carnation testified,
however, that he understood this as an instruction not to call
again that day.  Colarulo testified that he had been clear that
Carnation was not to call Moroney again at all.  It is undisputed
that, the next day, Carnation called the 25th District again and
spoke to Moroney.  Carnation testified that he called only once;
Colarulo testified that he understood Carnation did so a number
of times.  5/7/08 N.T. at 181-85, 207-10; 5/8/08 N.T. at 165-69;
5/13/08 N.T. at 105-06.

It is undisputed that, on the Sunday of Memorial Day
weekend at around 8:30 in the morning, Carnation called Colarulo
at his vacation home.  According to Carnation's testimony, he
called to let Colarulo know that, as a result of his conversation
with Moroney the day before, he had resolved several of his
issues with Moroney but still wanted to meet with both Colarulo
and Moroney.  According to Colarulo, Carnation was rambling and
angry and admitted that he had called Moroney in violation of
Colarulo's order.  Colarulo also testified that Carnation said he
was "tired of all this shit" and that he agreed with what "Bill

---

[14]    Moroney's trial testimony concerning these messages
supported Colarulo in part.  Moroney testified that Carnation
called the station three times on Friday and left messages asking
to have his check delivered to his house.  He did not say
anything in his testimony about Carnation telling him that
Colarulo wanted him to set up a meeting.  5/9/08 N.T. at 66-68.

McKenna had said about Moroney" that he "should be shot in the head." 5/7/08 N.T. at 185-186, 209-12; 5/8/08 N.T. at 169-71; 5/13/08 N.T. at. 106-07, 176.

Colarulo testified that after that telephone call, he contacted Carnation's active supervisor and the Employee Assistance Program about Carnation's behavior, and on the first day that he went back to work after the holiday, he started an investigation and requested that disciplinary action be taken against Carnation. In mid-July, Colarulo personally served Carnation, who was at that time no longer under his command, with notice of disciplinary action charging him with two counts of insubordination and one count of neglected duty. These charges were then the subject of the PBI hearing on January 19, 1999, and, ultimately, after the PBI added another charge, the basis for the PBI's recommendation that he be discharged. 5/7/08 N.T. at 188-89; 5/8/08 N.T. at 171, 177; 5/13/08 N.T. at 107-08.

Taken as a whole, this evidence would give a reasonable jury a legally sufficient basis to find Carnation's termination to be the result of Colarulo's retaliation. In reaching this conclusion, the Court, as it must, "disregards all evidence favorable to [the City] that a jury is not required to believe" and "gives credence to all evidence favoring [Carnation], as well as that evidence supporting [the City] that is uncontradicted and unimpeached, at least to the extent that it comes from

disinterested witnesses." <u>Reeves v. Sanderson Plumbing Prods.,</u>
<u>Inc.</u>, 530 U.S. 133, 151 (2000).

The jury was entitled to believe Carnation and
disbelieve Colarulo and Moroney about the events of the weekend
of Memorial Day 1998.  The jury could therefore have found that
Colarulo's order requiring Carnation to stop calling the station
was unclear, that Carnation understood it to require him only to
stop calling that day, and that Carnation therefore did not
knowingly violate the order by calling the station the next day.
The jury could also have found that, when Carnation called
Colarulo on Sunday morning, he never admitted violating the order
and never expressed agreement with William McKenna's wish to
shoot Sergeant Moroney.

If the jury believed Carnation and disbelieved
Colarulo, then it could reasonably infer that Colarulo's version
of the events of the Memorial Day weekend were untrue and
motivated by his expressed intent to retaliate against Carnation.
Because the events of that weekend formed the grounds for the
disciplinary charges against McKenna and the proceedings before
the PBI, a reasonable jury could find that Colarulo's animus
played a substantial role in the ultimate decision by the PBI to
recommend Carnation's termination, which under <u>Abramson</u> is
sufficient for the jury to impute Colarulo's retaliatory animus
to the PBI.  <u>Abramson</u>, 260 F.3d at 286; <u>see also</u> <u>Wallace v. SMC</u>

<u>Pneumatics, Inc.</u>, 103 F.3d 1394, 1400 (7th Cir. 1997) ("the prejudices of an employee, normally a subordinate but here a coequal, are imputed to the employee who has formal authority over the plaintiff's job . . . where the subordinate, by concealing relevant information from the decisionmaking employee or feeding false information to him, is able to influence the decision.").

2. <u>The Motion for a New Trial</u>

The City has moved for a new trial as to all three plaintiffs on all issues. The City does so on two grounds. It contends that the jury's verdict was improperly swayed by passion, prejudice, and confusion because of improper conduct by the plaintiffs' counsel, the plaintiffs, and the plaintiffs' spouses. It also seeks a new trial on the ground that the verdict was against the weight of the evidence, and in the alternative, seeks a remittitur of the verdict to an amount of $75,000 per plaintiff.

The standard for awarding a new trial differs for each of these two proffered grounds. A trial court is "entrusted with wide discretion" in determining whether to grant a new trial on the basis of attorney misconduct, but should do so only where it is "reasonably probable" that the verdict was influenced by prejudice resulting from the misconduct. <u>Forrest v. Beloit</u>

Corp., 424 F.3d 344, 351 (3d Cir. 2005); see also Fineman v.
Armstrong World Indus., 980 F.2d 171, 207 (3d Cir. 1992) (citing
Draper v. Airco, Inc., 580 F.2d 91, 97 (3d Cir. 1978)).

A trial court has less discretion in determining
whether to grant a new trial because the verdict, as to either
liability or damages, is against the weight of the evidence.  To
ensure that a district court does not substitute its judgment of
the facts and the credibility of the witnesses for that of the
jury, a trial court "ought only to grant a new trial on this
basis where a miscarriage of justice would result if the verdict
were to stand.'"  Fineman, 980 F.2d at 211 (quoting Williamson v.
Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991).  A
trial court has less discretion to grant a new trial on this
basis in a case where "the subject matter of the litigation is
simple and within a layman's understanding" than in a case that
"deals with complex factual determinations."  Williamson, 926
F.2d at 1352.

> a    New Trial Based on the Misconduct of the
>      Plaintiffs' Counsel, the Plaintiffs, and the
>      Plaintiffs' Spouses

The City points to numerous instances during the trial
of what it characterizes as misconduct.  These instances group
into three broad categories:  repeated references by counsel and
witnesses to claims and evidence previously excluded in pre-trial

77

rulings; disrespectful and contemptuous behavior by the plaintiffs and their counsel; and inflammatory and confusing references by the plaintiffs' counsel in closing argument to the movie A Few Good Men (Castle Rock 1992) and to the "C Word."

### 1)    References to Non-Triable Issues

Prior to trial, the Court issued an order setting out the specific triable issues that it determined had been remanded by the court of appeals.  Order of May 1, 2008 (Docket No. 131 in Case 98-5835; No. 150 in Case No. 99-1163).  One issue deliberately not included in the order was the plaintiffs' claim that they had suffered actionable retaliation from their harassment by fellow officers who had described them in radio comments and bathroom graffiti as "rats" and "snitches."   In remanding the case for trial, the court of appeals specifically held that the plaintiffs had failed to make out a prima facie case of retaliation with respect to those co-worker actions: "[T]he record does not support a reasonable conclusion that the plaintiffs' supervisors failed to take adequate remedial action in response to the 'rat' and 'snitch' graffiti and comments." Moore, 461 F.3d at 350.

In a separate pre-trial order on the parties' motions in limine, the Court considered the plaintiffs' request to be permitted to introduce evidence concerning acts of racial

discrimination of which the plaintiffs were unaware and which, therefore, could not have formed a basis for their complaints to their supervisors.  The Court ruled that such evidence was generally not relevant and, if the plaintiffs wished to present some specific evidence in this category, they should first present it to the Court.  The Court cautioned the parties that the trial should not become a "generalized discussion of discrimination by the police against African-Americans," which would be confusing and misleading to the jury and whose probative value would be outweighed by prejudice.  Instead, the Court exhorted the plaintiffs to focus their testimony on "their own experiences: what they saw and what they knew about that formed the basis for their complaints."  Order of May 1, 2008 (Docket No. 132 in Case 98-5835; No. 151 in Case No. 99-1163).

### 4)  References By Counsel to Non-Triable Issues

Beginning with his opening statement, the plaintiff's counsel repeatedly referred to issues beyond those the Court had specified could be tried to the jury.  In his opening, the plaintiffs' counsel, in describing adverse actions directed to the plaintiffs, at three points referred to the word "rat" being written on the wall of the station bathroom, being written on the plaintiffs' time cards, or being said on the police radio.  5/5/08 N.T. at 39-40, 43, 44.  The plaintiffs' counsel also

referred to events that occurred to Michael McKenna after he was transferred from the 25th District, including the department's decision to remove his service weapon for safety reasons and its subsequent search of his house and his son's being stopped by the police.  Id. at 51-52.

At the reference to Michael McKenna's son, the counsel for the City objected to the mention of events beyond those at issue in the trial.  After a sidebar, the Court sustained the objection, specifically cautioning counsel that the references to "rats" concerned actions taken by co-workers that had been held to be non-actionable by the court of appeals.  Id. at 53.  The Court then sustained subsequent objections by the City to plaintiffs' counsel's references to the department's sick checks of Raymond Carnation and to the department's alleged contact with Carnation's subsequent employer after his termination.  At a side bar to discuss the second objection, the Court alluded to the possibility that the trial might have to "start again."  Id. at 60.

After both sides' opening statements, in dismissing the jury for the day, the Court emphasized to the jury that the statements of counsel were not evidence.  Id. at 72.  After the jury was dismissed, the Court then engaged in a lengthy discussion with counsel concerning its evidentiary rulings.  The plaintiffs' counsel noted that there were many incidents that

might not rise to the level of an actionable adverse action under the Court's rulings, that might need to be mentioned as "context."  The Court agreed that things might need to be put in context but that it did not want the jury confused and that it was "afraid it could be," particularly with respect to the City's responsibility for the "rat" comments.  Id. at 75.  As part of this discussion, the Court stated it was open to giving curative instructions concerning statements made in both sides' openings, including an instruction concerning the City's lack of responsibility for co-worker harassment.  Id. at 74, 76.

The next day, testimony began with plaintiff William McKenna.  The plaintiffs' counsel elicited without objection testimony from McKenna that a poster in the station had been vandalized to link him and Raymond Carnation with a picture of a piece of cheese, suggesting that they were "rats."  5/6/08 N.T. at 48-49.  The plaintiffs' counsel then asked McKenna about one of his time sheets, and McKenna testified that someone had written on them the words "Rat No. 1," and that, when he complained to Sergeant Moroney, Moroney told him, with several expletives, to get it out of his face.  Id. at 50.  After this, the defense counsel objected on the ground that the testimony was "out of context."  Id. at 51.

At sidebar, the Court stated that the testimony went well beyond context and was "unfair and confusing."  5/6/08 N.T.

at 51.  The Court indicated that it thought a curative
instruction was necessary, and the City's counsel then moved for
one.  The Court recessed the jury to discuss the issue with
counsel.  The Court reemphasized to counsel that, based on the
court of appeals decision in Moore, incidents of coworker
harassment such as the references to "rats" and "snitches" were
not in the case.  The Court also noted that, although defense
counsel had not objected, the plaintiffs' counsel's questioning
had been improperly leading and directed the plaintiffs' counsel
not to lead his witness.  The Court commented that it understood
the defense counsel's dilemma in not wanting to make too many
objections, but that the leading testimony was improper.  Id. at
52-53.

The Court then recalled the jury and gave them the
following curative instruction:

> The issue in this trial, as you know, is
> whether the supervisors, the leadership of
> the police department, retaliated against the
> plaintiffs for the plaintiffs['] protesting
> racial discrimination.  The case is not about
> the conduct of fellow officers towards the
> plaintiffs.  I instruct you that whether or
> not particular coworkers used the word rat or
> did other things, such as not providing back
> up to the plaintiffs, it's not to be
> considered by you as evidence of retaliation
> by the City of Philadelphia.

Id. at 54.

Despite the colloquy and the curative instruction, a
few minutes later, plaintiff's counsel directed William McKenna's

attention to a meeting with his brother Michael in January 1998 and asked whether anything occurred. McKenna responded that his brother had told him about graffiti on the bathroom walls that named both of them. The City's counsel objected. The Court sustained the objection and instructed the jury to ignore the comment. Id. at 57.

At the end of the same day of testimony, at the start of Michael McKenna's direct examination, the plaintiffs' counsel asked McKenna if his fellow officers treated him differently after he reported to Sergeant Moroney that some officers were filing false reports to obtain extra pay. McKenna responded by mentioning the bathroom graffiti calling him a rat or a snitch. The Court sustained the defense objection and called a side bar at which it cautioned plaintiffs' counsel that this subject was excluded and announced that it would recess for the day to allow counsel to clear the issue up with his witness. Id. at 225.

The next day, before recalling the jury, the Court held a colloquy with counsel to discuss the repeated references to coworker harassment. The plaintiffs' counsel argued that such evidence was relevant because, even if the City was not directly responsible for harassment by coworkers, it could be liable for its supervisors' inaction, such as for failing to clean up the "rat" graffiti. The Court explained that the court of appeals had specifically rejected this argument in Moore. 461 F.3d at

350. The Court then instructed counsel that the continued references to "rats" ran the risk of confusing the jury and that they should stop:

> Look, I'm going to rule that the rat stuff --
> I was allowing it in for background context.
> I think the jury gets it at this point . . .
> a fair amount of time was spent on that and I
> think its going to confuse[ ] them at this
> point.  So in view of the summary judgment
> decision and the danger of what's happening,
> confusing, misleading.  I'm going to rule no
> more rat testimony.

5/7/08 N.T. at 13.

After this instruction, there were no more references to rats or other coworker harassment during Michael McKenna's testimony.[15]  There was one reference to coworker harassment in Raymond Carnation's direct examination.  The plaintiff's counsel asked Carnation an open-ended question as to whether there was anything else that he viewed as "different treatment" in February of 1998, and Carnation answered "[j]ust no relief, no backup, no breaks, writing on the bathroom walls, posters hanging within the

---

[15]    The City also complains that Michael McKenna was allowed to testify concerning events that occurred after his transfer from the 25th District.  Both the court of appeals and this Court found that these post-transfer actions were not themselves actionable.  See Moore, 461 F.3d at 351 n.10; Order of May 1, 2008 (Docket No. 131 in Case 98-5835; No. 150 in Case No. 99-1163).  The Court allowed a limited amount of testimony concerning the department's post-transfer actions in investigating McKenna's assault by Officer Seeger, but sustained the City's objection and cut the testimony off when it extended beyond context into an account of persecution.  5/7/08 N.T. at 69-73.

Districts, being surveillance by the supervisors." The Court sustained the City's objection to the response and ordered it stricken from the record. The Court then asked Carnation not to discuss that subject and instructed the jury to "ignore that about posters and the like[;] I've already given you an instruction on that." 5/7/08 N.T. at 173.

In addition to eliciting testimony concerning coworker harassment, plaintiffs' counsel also attempted to elicit testimony concerning acts of discrimination allegedly taken against other officers. In his examination of Sergeant Moroney as on cross, the plaintiffs' counsel questioned him about whether he had ever assigned Michael McKenna to work with Officer Myrna Moore or assigned them to "stand a block corner" together. Moroney said that he had not and could not have assigned the two to work together because McKenna and Moore were not in the 7-squad at the same time while he was supervisor. The plaintiffs' counsel then asked Moroney "[s]o [Moore] would have had no reason ever to state a complaint against you for racism." The City's counsel objected to the question and the Court sustained the objection. 5/9/08 N.T. at 52-53. Six short questions later, when the plaintiffs' counsel directed Sergeant Moroney's attention to the transcript of an interview he had with the department's Equal Opportunity Office ("EOO"), the Court called a short sidebar with counsel to clarify how the plaintiffs' counsel

intended to use the document and to make clear that the plaintiffs' counsel was not to ask questions concerning Officer Moore: "[Y]ou're not supposed to ask about Myrna Moore. You know that. So stay away from it." Id. at 54-55.[16]

Although the plaintiffs' counsel did not elicit further testimony concerning Officer Moore in the rest of his examination of Sergeant Moroney as on cross, he raised the issue again in a colloquy with the Court during his re-cross examination of Moroney after the City's direct.[17] Outside of the presence of the jury, the plaintiffs' counsel told the Court that he believed the City's direct examination had opened the door to questioning Moroney about Moore's complaints against him. On direct, Moroney had been asked whether, during the time that he was supervisor of the 7-squad, any African American officers had complained to him

---

[16] The issue also arose in the plaintiffs' counsel's examination of Captain Colarulo as of cross, when the plaintiffs' counsel sought to question Colarulo concerning a 71-page statement that he had given to Internal Affairs. The statement concerned both actions he had taken with respect to the three plaintiffs and actions taken with respect to the African-American plaintiffs who had settled their cases with the City. The City objected to the testimony and to the relevance of the statement to the extent it concerned other officers, and the Court sustained the objection. 5/8/08 N.T. at 52-57.

[17] Both Sergeant Moroney and Captain Colarulo were called in the plaintiffs' case as on cross. With the agreement of counsel, after the plaintiffs' on-cross examination of each witness, the City conducted a direct examination, not limited to the scope of the on-cross testimony, and the plaintiffs then conducted a re-cross examination.

about unfair treatment or about feeling isolated in the squad, and had said that they had not.  5/9/08 N.T. at 83-84.

During the colloquy, the Court indicated that this testimony might permit the plaintiffs to ask Moroney about complaints against him by Officer Moore and other African American officers, but that the Court first needed to make sure that there was a good faith basis for finding the accusations to be impeaching.  The Court explained that, before any such evidence could be used, the plaintiffs' counsel would have to identify with precision exactly what accusations by African American officers against Moroney he wanted to use, so that the Court could assess them.  5/9/08 N.T. at 111-13.  The Court also stated that it was concerned whether there was a basis for using Moore's statements to impeach because the City had introduced record evidence indicating that Moore was not transferred to the 7-squad until after Michael McKenna had been transferred out. Id. at 114-15.

The Court returned to the issue after a recess.  During another lengthy colloquy outside the presence of the jury, the Court denied the plaintiffs' counsel's request to impeach Moroney with Moore's statements in her EEO complaint and Fraternal Order of Police grievances that Moroney had used racial epithets.  The Court found that, in those filings, Moore did not say that she had heard Moroney use racial epithets, but only that she had

heard the McKennas say that Moroney used those words.  The Court

also found that her complaints about discrimination concerned

events that occurred before her transfer to the 25th District.

The Court therefore refused to allow the plaintiffs' counsel to

impeach Moroney with Moore's statements or with the fact that she

had joined in filing complaints against him.  The Court did allow

the plaintiffs' counsel to ask Moroney whether another African-

American officer, Richard Safford, had ever accused him of using

racially offensive language.[18]  5/9/08 N.T. at 122-129.

The plaintiffs' counsel also attempted to introduce

testimony concerning complaints of racism by other officers in

his examination of Rochelle Bilal, a police officer and a member

of the Guardian Civic League, an organization for the support of

African American police officers.  Officer Bilal was called by

the plaintiffs to rebut testimony by Captain Colarulo that Bilal

had approached him in June of 1998 to apologize to him for having

---

[18]    After the Court had ruled Moore's complaints
inadmissible as impeachment, the plaintiffs' counsel continued to
argue the issue and complain about the ruling for several
minutes, outside the presence of the jury.  Among other comments,
counsel said that the ruling was "not fair," that he was
"hamstrung," that the witness was now "free to lie all he wants,"
and he was being "barred from doing the most basic impeachment."
5/9/08 N.T. at 122, 124, 127, 128, 129.  The colloquy concluded
with the plaintiffs' counsel saying he would not seek to
introduce impeachment on Moroney's statement that no one ever
complained to him of being unfairly treated or of being isolated,
but instead he would "take [his] appeal."  Id. at 129.  The
plaintiffs, however, did not include the Court's ruling on this
issue as one of the claims of error in their post-judgment
motion.

supported the McKennas and to tell him that after looking into

their allegations, she believed them to be false.  5/8/08 N.T. at

59-60.  The plaintiffs' counsel, however, began his examination

by asking her if she had ever contacted the police department

concerning any complaints of racism at the 25th District in 1997,

1998, or 1999.  The defense objected and the Court sustained the

objection and limited the questioning of the witness to whether

she had ever apologized to Colarulo for anything she had done

with respect to the McKenna brothers.  Officer Bilal denied any

apology.  5/12/08 N.T. at 35-40.


              b)     References By Plaintiffs and Their
                     Spouses to Non-Triable Issues

      In addition to what it contends was improper

questioning by the plaintiffs' counsel, the City also contends

that the plaintiffs and their spouses committed misconduct by

volunteering answers concerning irrelevant and inadmissible

issues.  William McKenna, in responding to questioning from his

counsel concerning his confrontation with Deputy Commissioner

Norris over his wife's arrest for trespassing at the house of

another deputy commissioner, said that he told Norris that he

wanted to know "the status of [his] wife" because "she just had a

miscarriage."  The City objected and the Court sustained the

objection.  5/6/08 N.T. at 113-114.[19]

Later in William McKenna's direct testimony, in

response to a series of questions concerning how the City's

alleged retaliatory actions affected his life, McKenna said that

they, among other things, limited what he could do with his

daughter.  Asked to explain, McKenna began an emotional stream-

of-consciousness monologue about his poverty, his inability to

give his daughter what she wanted, and the City's actions in

conducting sick checks, during which he at one point appeared to

dare the City's counsel to object:

> Keep in mind my daughter was eight years old.
> I'm sure if everybody has an eight-year old,
> you want to do things with your kid.  This
> kid wasn't able to get anything.  We were
> poor.  We were poor.  All we did was pay a
> mortgage, put gas in the car, go to the
> doctors, not even visit my mom, the person
> who you're supposed to love.  You couldn't,
> when you lay in that fetal position, who
> wants to go.  You can't go anywhere.  So you
> just felt like a prisoner in your own home
> because they -- go ahead object -- they loved
> it.  Every day they would come to the house
> and just knock on the door, knock on the
> door, harass my daughter, harass my wife.  We
> couldn't tolerate it.  My wife did what she
> did to stop that because desperate people do
> desperate things.  How else could we get them
> to stop coming to the house.  What else [do]
> they want you to do.  They want you to come
> out the door and physically fight with them.

---

[19]    William McKenna's wife also mentioned her miscarriage
in testimony describing the things she told officers who came to
her house to perform sick checks.  5/12/08 N.T. at 62.

> They'd tell me, "come on, come at me" because
> they're the police, the police can do what
> they want.  And they've done it and they're
> . . .

5/6/08 N.T. at 119-20 (emphasis added).  Although the City's
counsel did not make an objection, the Court interrupted the
monologue, thanked the witness, and called a side bar to explain
that it stopped the testimony because the response had gone "way
beyond what is appropriate."  Id. at 120.

The wives of the McKenna brothers also volunteered
irrelevant and inadmissible evidence in their testimony.  Michael
McKenna's wife, Beth McKenna, asked how her family's life had
been after Michael's assault by Officer Seeger, said that they
had been "emotionally, financially, and spiritually devastated"
and then added that "[t]here was a death threat to have Mike
murdered that Capt. Colarulo knew about."  The City objected, and
the Court sustained the objection and ordered the testimony
stricken.  5/12/08 N.T. at 131-32.

William McKenna's wife, Cynthia Palamone, was asked to
describe the department's sending officers to her home to conduct
sick checks on her husband.  She began her response by saying
that the sick checks started in November 1998, but then said that
her brother-in-law Michael McKenna had filed a federal lawsuit
against the City and "the very same day" her husband was "tossed
out" of his assignment at the police academy and was "told  . . .
to go home and run out his sick time."  5/12/08 N.T. at 46.  The

City objected and the Court sustained the objection, striking the testimony and instructing the witness not to give hearsay testimony but to testify only as to what she herself knew.

In further questioning, Palamone was asked whether, prior to the sick checks, she had had concerns about her husband's well-being. She testified that she had concerns around the time her husband made the statement on February 13, 1998, that Sergeant Moroney deserved to be shot. She testified that she went to speak to Captain Colarulo because: ". . . we had other weapons in the home and I was concerned that why they were doing what they did to him [sic]. Why Captain Colarulo would do that." 5/12/08 N.T. at 49. The Court sustained the City's objection to the testimony and instructed the plaintiffs' counsel to question the witness only as to what she saw.

The plaintiffs' counsel then asked Palamone whether her husband was doing anything at home to cause her concern, and Palamone responded by saying that her husband had told her what was happening in the district. The Court then interrupted the witness's testimony to instruct her not to say what her husband had told her. Id. at 50. The plaintiffs' counsel then questioned Palamone about the subject of her conversation with Captain Colarulo and she responded that, although she had not been able to speak with Colarulo, she spoke with a Lieutenant Krauss and raised her concerns about "reports of racism going on

in the police district." Id. at 51.  The City objected, and the
Court sustained the objection.  The Court instructed the jury to
ignore Palamone's statement and instructed the witness again not
to "tell us anything that you were told by other people."  Id.
The Court then called a sidebar to instruct the plaintiffs'
counsel that his witness would not be allowed to continue to
attempt to offer hearsay testimony about facts outside her
personal knowledge.  Id. at 51-52.

> 2) Disrespectful Conduct by the Plaintiffs
> and their Counsel and References at
> Closing to A Few Good Men and to the
> "C word"

In addition to basing its new trial motion on
references to excluded claims and inadmissible evidence, the
plaintiffs also point to disrespectful and inflammatory conduct
by the plaintiffs and the plaintiffs' counsel and to certain
objectionable references made by the plaintiffs' counsel in
closing arguments.

The most serious misconduct occurred during the
testimony of the City's witness, former Deputy Commissioner
Nestel.  Deputy Commissioner Nestel had testified on direct
concerning an incident in which William McKenna's wife, Cynthia
Palamone, came to his house at 10:00 at night to complain about
sick checks being performed on her husband.  Nestel testified
that Palamone banged on his door, rang the doorbell, and yelled,

saying she was here to harass him and his wife until the
department stopped harassing them.  Nestel testified that he then
grabbed Palamone and arrested her.  5/13/08 N.T. at 53-54.

The plaintiffs' counsel then began an aggressive cross-
examination.  After the City objected to a question as beyond the
scope of cross, and the Court sustained the objection, the Court
called a sidebar and told counsel that it had observed the
plaintiffs, particularly Raymond Carnation, "smirking" at the
ruling and looking at the jury.  5/13/08 N.T. at 62-63.  The
Court stated that this behavior was sufficiently severe that the
Court was concerned that the jury had been "tainted" and warned
the plaintiffs' counsel that he faced the possibility of a
mistrial if the defendant were to move for one:  "Do you want to
try this case again?  You may have to if I get a request from the
defendants."  Id. at 64.  Shortly afterward, the Court declared a
recess.

Before the jury returned, the Court held a lengthy
sidebar with counsel to discuss the plaintiffs' behavior.  The
Court expressed concern that the conduct that the Court had seen
was so "breathtaking" that it called into question how the
plaintiffs had been behaving during sidebar discussions when the
Court and counsel's attention were focused elsewhere.  The Court
also expressed its astonishment at the level of disrespect shown
by the plaintiffs' conduct and told counsel that, during the

recess, it had seriously considered ordering the plaintiffs removed from the courtroom. The Court emphasized that it understood that plaintiffs' counsel had been trying to control his clients and that he was not to blame for their misconduct, but stated that it did not want to see the plaintiffs looking at the jury or doing anything to potentially influence them. 5/13/08 N.T. at 68-71, 73. The plaintiffs' counsel told the Court that he had not been aware of the behavior, but had discussed the issue at length with his clients during the recess, telling them that, if such behavior was occurring, it had to stop in order for them to get through the trial. Id. at 72-73.

During the discussion, counsel for the City indicated that he had not personally seen the behavior referred to by the Court, although he had questioned his staff and they had confirmed having seen some inappropriate conduct. The City's counsel stated that he was concerned that the jury might have been tainted but, instead of moving for a mistrial, stated only that "if the Court thinks that it's time for a mistrial, I would certainly defer to the Court's judgment." 5/13/08 N.T. at 69. The City's counsel also suggested that the plaintiffs might intentionally be seeking to "derail the whole process" and stated that he was unsure of what to do. The Court also admitted uncertainty as to how to proceed, but suggested going forward to see "where the whole case goes," while permitting the City to

95

reserve its right to ask for a mistrial or a sanction of dismissal.  Id. at 73-74.

In its motion, the City does not contend that there were any subsequent incidents of similar misconduct by the plaintiffs.  The City does point to one incident of disrespect by the plaintiffs' counsel.  During plaintiffs' counsel's redirect of William McKenna, on the second day of trial, the Court sustained an objection to a question regarding the contents of McKenna's PHRC complaint as beyond the scope of cross.  The plaintiff's counsel then said, in the presence of the jury, "I beg to differ."  The Court immediately called a side bar to remind counsel that objections were to be argued only at sidebar and directing him not to make speeches in front of the jury. 5/6/08 N.T. at 224-25.

The City also points to several instances during the trial where the plaintiffs' counsel's questioning of the City's witnesses was sarcastic or argumentative.  In each, the Court sustained the City's objection to the improper question.  5/8/08 N.T. at 183, 186; 5/9/08 N.T. at 58; 5/12/08 N.T. at 186.  The Court also cautioned the plaintiffs' counsel at side bar on at least two occasions that the tone of his questioning was unduly ridiculing or improperly implied a contradiction in testimony where there was none.  5/8/08 N.T. at 55; 5/12/08 N.T. at 186.

The City argues that the plaintiffs' counsel made
several improperly inflammatory and confusing references in his
closing argument.  The plaintiffs' counsel began his closing with
a confusing description of the movie A Few Good Men, which
counsel described as a movie about "code reds, a secret
discipline, things like that" and "two marines who follow an
order but don't do the right thing" and another marine, "a
private named Santiago who is killed by a code red," which is a
"discipline that's supposed to not exist, but the Marines use it
to bring the Marine into good order [and] discipline and keep
morale high."  5/14/08 N.T. at 67-68.  Counsel described the
movie as standing "for doing the right thing," which was what his
clients had done in standing up against racism in the police
department.  The plaintiffs' counsel summarized the issue for the
jury as whether they accepted the evidence that his clients
opposed racism and whether the things that happened to them
afterward occurred because of their opposition.  Id.

The plaintiffs' counsel briefly referred to the movie
again in describing Michael McKenna's transfer from the 25th
District, saying that the incident reminded him of A Few Good Men
where "they were transferring Private Santiago for his safety."
He then began giving the jury "a little background" into Private
Santiago's predicament, at which point the Court interrupted to

97

suggest that he return to discussing his client's case.  Id. at
87.

The City also claims misconduct in the plaintiffs'
counsel's misleading reference to the "C word."  In his closing,
the plaintiffs' counsel referred to Sergeant Moroney's use of
both the "N word" and the "C word," in one instance referring to
his use of the word to describe Officer Myrna Moore.[20]  5/14/08
N.T. at 71, 81.  The "C word" to which counsel was referring was
not the vulgarity for female genitalia usually associated with
that phrase, but the word "critter," which Moroney had been
accused in trial testimony of using to describe African American
officers.  Id. at 106.

The City also complains that the plaintiffs' counsel's
closing argument improperly suggested that the City could be
found liable for William and Michael McKenna's terminations.  In
closing, the plaintiffs' counsel noted that "all of the bad
things that happened to the plaintiffs" were not in dispute:
"They don't tell you we didn't suspend him.  They don't tell you
we didn't fire him. They didn't tell you he didn't get

_____

[20]    The plaintiffs' counsel stated in his closing that
Moroney had used the "C word" -- "critter" -- in referring to
Moore during the incident in which Moroney ordered her and
Michael McKenna to stand in the rain.  5/14/08 N.T. at 81.  This
mischaracterized the testimony at trial, although in a way
favorable to the City.  The testimony concerning this incident by
Michael McKenna was that Moroney used the word "nigger," not
"critter," in referring to Moore.  5/7/08 N.T. at 24.

98

permanently injured." 5/14/08 N.T. at 104. Counsel for the City objected in a sidebar after the argument, and the Court responded that its instructions would make clear that the jury was not to award damages to either of the McKennas resulting from their terminations. Id. at 142.

      3)   Whether the Misconduct Warrants a New Trial

   As set out above, the City has identified numerous incidents of putative misconduct on the part of the plaintiffs and their counsel. These can be grouped into three broad categories: references to excluded issues, such as coworker harassment, or to inadmissible evidence; disrespectful conduct on the part of the plaintiffs and their counsel; and improperly confusing and inflammatory references at closing argument. Taken individually, none of these categories of misbehavior is sufficient to warrant the grant of a new trial.

   The repeated questioning and testimony concerning coworker harassment was of concern to the Court throughout the trial. As the Court explained in sidebars with counsel, although it did not order all mention of coworker harassment excluded from trial, such testimony was permissible only to the extent that it provided context to the other events at issue.

   The Court policed the issue throughout trial, both sustaining the City's objections and, at its own suggestion,

giving the jury a curative instruction that "the conduct of fellow officers towards the plaintiffs," including the use of the word "rat" or lack of back-up, was not to be considered as evidence of retaliation by the City. 5/6/08 N.T. at 54. The Court also sought to counteract any taint from the references to irrelevant and non-actionable incidents in the plaintiffs' counsel's opening statement by reminding the jury as it was discharged on the first day of trial that statements of counsel are not evidence. 5/5/08 N.T. at 72.

The Court also carefully monitored any attempt to introduce evidence concerning allegations of racially discriminatory treatment made by other officers. The Court _sua sponte_ called a sidebar to ensure that the plaintiffs' counsel did not ask about other officers' allegations in questioning Sergeant Moroney about his interview with the department's EEO office. The Court also circumscribed the plaintiffs' counsel's use of such evidence to impeach Moroney. 5/9/08 N.T. at 54-55, 111-15. The only example in the City's motion of testimony concerning other officers' allegations of racism reaching the jury is Cynthia Palamone's hearsay outburst mentioning "reports of racism going on in the police district," which the Court immediately instructed the jury to disregard. 5/12/08 at 51.[21]

_____

[21]    The Court was also conscious throughout the trial of the impact of excessive sidebar conferences on the jury and attempted to hold conferences with counsel during recess. The

Although some improper references to excluded issues reached the jury despite the Court's efforts, the Court does not find that these references, even considered collectively, justify a new trial. Whatever impact these references might have had on the jury was mitigated by the Court's curative instruction and by the format of the jury's verdict sheet, which required the jury to make findings as to the City's responsibility for each of the separate actionable adverse events that the Court had found triable under the <u>Moore</u> decision. The structure of the jury sheet necessarily channeled the jury's deliberations to only those incidents at issue in the case, diminishing the effect of any references to non-actionable incidents.

Of greater concern to the Court during the trial was the improper behavior of the plaintiffs, and to a lesser extent, of the plaintiffs' counsel. As the Court set out on the record at trial, the plaintiffs' misbehavior during the testimony of former Deputy Commissioner Nestel, looking at the jury while making contemptuous faces in reaction to the Court's adverse rulings, was astonishing in the level of disrespect it showed to the witness and to the proceedings. As reflected in the record,

---

Court specifically instructed counsel at the beginning of the third day of testimony to limit their objections and to raise evidentiary issues during recesses, rather than requesting sidebars. <u>See, e.g.</u>, 5/8/08 N.T. at 10.

the Court was, and remains, concerned that the plaintiffs' behavior could have affected the jury.

At the time this misbehavior occurred, when the Court had the opportunity to observe first-hand the effect on the jury, the Court declined sua sponte to sanction the plaintiffs or hold them in contempt. Nor did the City request an immediate mistrial in response to the Court's inquiry at the time. Instead, after the Court severely cautioned counsel about the seriousness of his clients' behavior, the behavior did not reoccur.

Having received no motion for a mistrial at the time of the incident, and having seen no repeat of the misbehavior, the Court is reluctant to grant a mistrial on this basis now. The Court also notes, in potential mitigation of the misconduct, the plaintiffs' long history of mental health issues, extending back before the events at issue in the trial. In particular, the plaintiff whose behavior most disturbed the Court, Raymond Carnation, has a history of severe depression beginning in the mid-1990s and continuing through the time of trial. 5/7/08 N.T. at 191-92, 196-97; 5/18/09 Tr. at 89-90.[22]

The Court finds that the plaintiffs' misconduct does not, by itself, warrant the grant of a new trial. The Court reaches the same conclusion with respect to the other

---

[22] The May 18, 2009, Notes of Testimony are from the evidentiary hearing held on Carnation's equitable damage claim.

inappropriate conduct by the plaintiffs and their spouses
identified by the City.  The various outbursts by the plaintiffs
and their spouses concerning irrelevant issues, most of which
were cut off by the Court, were not so pervasive as to require
that the case be retried.

The challenged statements in the plaintiffs' counsel's
closing argument similarly do not rise to the level that would
warrant a new trial.  The reference to the movie <u>A Few Good Men</u>
was inappropriate.  The movie concerns a marine killed by his
fellows upon the orders of a superior.  This case involves
similar issues, in particular whether Michael McKenna's assault
by his fellow officer was instigated by Sergeant Moroney, but
does not involve a death.  The plaintiffs' counsel's use of the
movie, however, was relatively brief, and counsel was cut off by
the Court when he attempted to mention it a second time.  In
addition, the plaintiffs' counsel's discussion of the movie was
disjointed and confusing and more likely to lose the jury's
attention than to inflame it.

The reference by plaintiff's counsel in closing
arguments to the "C word" was confusing, but in the context of
this case, the Court cannot find that it caused the defendant
prejudice.  In this context, both meanings of the phrase, the "C
word," are highly offensive.  The usual meaning, not applicable
here, is to a vulgar sexual term.  The meaning as used by

plaintiffs' counsel was to testimony that Sergeant Moroney used the word "critter" to refer to African American officers. Given that the issue for the jury was whether the plaintiffs were retaliated against for opposing racial discrimination, the possibility that the use of the "C word" may have confused the jury into thinking Sergeant Moroney used a sexually-offensive term rather than a racially-offensive one did not necessarily prejudice the jury.

Although none of the different categories of misconduct referenced by the City is alone sufficient to require the grant of a new trial, the Court must consider whether all of the instances of misconduct, considered in their entirety, so undermines the jury's verdict as to make a new trial necessary. See Draper v. Airco, Inc., 580 F.2d 91, 97 (3d Cir. 1978). The Court finds this to be a close question. Viewing all the instances of misconduct as a whole, the Court finds that there is certainly a possibility that the prejudice resulting from the misconduct by the plaintiff's counsel, the plaintiffs, and their spouses influenced the verdict. This is particularly so given the brevity of the jury's deliberations and the large amount of the verdict. The grant of a new trial, however, requires more. It requires that the Court find it to be "reasonably probable" that the jury's verdict was influenced by the prejudice caused by the misconduct. Forrest v. Beloit Corp., 424 F.3d 344, 351 (3d

Cir. 2005) (holding that although counsel "crossed the line," in referring to excluded demonstrative evidence in closing, his conduct was not "so severe as to warrant a new trial.").

After much consideration, the Court finds that this standard is not met and declines to order a new trial based on the misconduct of the plaintiffs and the plaintiffs' counsel. In reaching this conclusion, the Court has considered the cumulative impact of the misconduct upon the jury and the effectiveness of the Court's efforts throughout the trial to curb and correct it. Although the Court was both disturbed and discouraged by the behavior of both the plaintiffs' counsel and the plaintiffs and their spouses, the Court does not find that the prejudice caused by their conduct was so great as to make it reasonably probable that it affected the verdict.

In reaching this decision, the Court has kept in mind the important and countervailing interests implicated by the motion. The City has a strong interest in having its liability determined by a jury that is unaffected by misconduct or prejudice. The plaintiffs have a strong interest in upholding a verdict received after ten years of litigation and avoiding the expense and delay of a retrial. The standard for granting a retrial on the basis of misconduct balances those interests in the slight favor of the verdict winner by requiring a "reasonable probability," not just a possibility, that a verdict was tainted

before a new trial can be ordered.  Applying that standard, the
Court declines to award a new trial on the basis of misconduct.

><b>b</b>    New Trial on the Ground that the Verdict Was
>          <u>Against the Weight of the Evidence</u>

The City also moves for a new trial on the ground that
the verdict was against the weight of the evidence.  In the
alternative, the City seeks a remittitur of the verdict.  The
Court will deny both the request for a new trial and the
remittitur, but denies the remittitur based only on the fact that
the verdict has been reduced by the statutory cap for Title VII
claims.

The showing necessary to receive a new trial on the
basis of the weight of the evidence is very high.  A Court is
permitted to grant a new trial on this basis only if the verdict
is tantamount to a miscarriage of justice.  <u>Fineman v. Armstrong
World Indus.</u>, 980 F.2d 171, 211 (3d Cir. 1992).  The Court has
already rejected the City's arguments that it was entitled to
judgment notwithstanding the verdict on some of the plaintiffs'
claims and that it was entitled to a new trial because the
verdict was tainted by prejudice from the plaintiffs' misconduct.
Having found that there was legally sufficient evidence for the
jury to have reached its verdict and that it is not reasonably
probable that the verdict was swayed by prejudice, the Court

finds that the plaintiffs' verdict does not amount to a miscarriage of justice and does not warrant a new trial.

The Court will similarly deny the City's request for a remittitur. To disturb a jury's damage award, the damages assessed "must be so unreasonable as to offend the conscience of the Court." Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir. 1989) (internal quotation omitted). The jury's compensatory damage award in this case was capped under Title VII at $300,000 per plaintiff, with plaintiff Carnation also receiving an award of $208,781 in back pay and $46,560 in pre-judgment interest on the back pay award. Given the plaintiffs' emotional testimony concerning the physical and psychological effects they suffered from the City's retaliation, all of which the Court must find credible in considering a request for a new trial, the Court does not find these damages so unreasonable as to warrant a new trial. See, e.g., Ridley v. Costco Wholesale Corp., 217 Fed. Appx. 130 (3d Cir. 2007) (non-precedential) (upholding an award of $200,000 in damages for pain and suffering in a wrongful discharge case).

The Court's denial of the City's request for a remittitur, however, is based solely on the verdict as capped under Title VII. If, for whatever reason, the statutory cap were found not to apply to the plaintiffs' claims so that the plaintiffs' damage award would be the uncapped amounts awarded by

107

the jury -- $2,000,000 for Raymond Carnation, $3,000,000 for William McKenna, and $5,000,000 for Michael McKenna -- then the Court would find those amounts sufficiently unreasonable to require a remittitur to the amounts of the statutory cap.

An appropriate Order will be issued separately.